UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____<br><br>DTZ, INC.,<br><br>     Plaintiff,<br><br>v.<br><br>UG2 LLC, LOUIS LANZILLO,<br>JOHN CORREIA, JEFFREY<br>PETERSON, ROBERT RYAN,<br>ARMANDO LEZAMA, ROBERT<br>DESAULNIERS, SCOTT BURNELL,<br>and JANET GUISTI,<br><br>     Defendants.<br>_____<br><br>UG2 LLC, LOUIS LANZILLO,<br>JOHN CORREIA, JEFFREY PETERSON,<br>ROBERT RYAN, ARMANDO LEZAMA,<br>ROBERT DESAULNIERS, and<br>SCOTT BURNELL,<br><br>     Plaintiffs-in-Counterclaim,<br><br>v.<br><br>DTZ, INC., UGL LTD., and ANTONIO<br>ANDRADE,<br><br>     Defendants-in-Counterclaim.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br><br>Civil Action No. 13-cv-10906-PBS |

## DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT, AND COUNTERCLAIMS OF UG2 LLC, LOUIS LANZILLO, JOHN CORREIA, JEFFREY PETERSON, ROBERT RYAN, ARMANDO LEZAMA, ROBERT DESAULNIERS AND SCOTT BURNELL AGAINST DTZ, INC. UGL, LTD., AND ANTONIO ANDRADE

Defendants UG2 LLC, Louis Lanzillo, John Correia, Jeffrey Peterson, Robert Ryan,

Armando Lezama, Robert Desaulniers, Scott Burnell and Janet Guisti submit the following

1

answer and affirmative defenses in the above-captioned matter.  Additionally, plaintiffs-in-counterclaim UG2 LLC, Louis Lanzillo, John Correia, Jeffrey Peterson, Robert Ryan, Armando Lezama, Robert Desaulniers, and Scott Burnell submit the following counterclaims against defendant-in-counterclaim, DTZ, Inc., and defendants-in-counterclaim UGL, Ltd. and Antonio Andrade, who are joined pursuant to Fed. R. Civ. P. 13(h), 19 and 20.

## INTRODUCTION

The introductory paragraphs of plaintiff's First Amended Complaint consist of legal conclusions and general characterizations of the parties and the nature of this action to which no response is required.  To the extent a response to plaintiff's introductory paragraphs is required, defendants deny all factual assertions therein.  Further responding, defendants state that plaintiff DTZ, Inc. ("DTZ") has brought this action in an attempt to inhibit defendants' lawful competition against DTZ.  DTZ did not meaningfully protect its so-called "confidential" information, much of which is in the public domain, and the alleged employment agreements on which it bases its claims are unenforceable.  DTZ's business woes are the result, among other things, of its poor treatment of its employees, its neglect of its New England Operations Headquarters in Boston, its Newton corporate office, and its facilities management and facilities services book of business, as well as its decision to cannibalize its own business by competing directly against its facilities management clients for leasing-related and property management-related services.

## PARTIES

1.      Admitted.

2.      Defendants admit that UG2 LLC ("UG2") is a Massachusetts limited liability company, but denies that UG2's current principal place of business is 110 Walker Street, Weston, Massachusetts.

2

3.      Admitted.

4.      Admitted.

5.      Admitted.

6.      Admitted.

7.      Admitted.

8.      Admitted.

9.      Admitted.

10.     Admitted.

<u>JURISDICTION AND VENUE</u>

11.     The first sentence of paragraph 11 is denied.  As to the second sentence, defendants admit that DTZ has attempted to invoke supplemental jurisdiction pursuant to 28 U.S.C. § 1367, but deny that such jurisdiction exists.

12.     Defendants admit that the First Amended Complaint alleges acts that are purported to have occurred in this judicial district and division, and they otherwise deny the first sentence of paragraph 12.  Defendants admit that UG2's principal place of business, and that of DTZ, are located in Massachusetts, and they otherwise deny the second sentence of paragraph 12.  Defendants admit that John Correia, Jeffrey Peterson, Robert Ryan, Armando Lezama, Robert Desaulniers and Janet Giusti are former DTZ employees, and that the First Amended Complaint makes allegations of conduct that they are purported to have undertaken in Massachusetts, but defendants otherwise deny the third sentence of paragraph 12.  As for the fourth sentence, defendants admit that UG2 and Louis Lanzillo reside in this division and admit that DTZ alleges that they undertook actions in Massachusetts, and otherwise deny the fourth sentence of paragraph 12.

3

FACTUAL ALLEGATIONS

13.     The first and second sentences of paragraph 13 are admitted.  Defendants lack information sufficient to form a belief as to the truth of the third sentence of paragraph 13.  The fourth sentence of paragraph 13 is admitted.  The fifth sentence is denied.

14.     The first sentence of paragraph 14 is denied.  The second sentence of paragraph 14 is admitted.  The third sentence of paragraph 14 is denied.  Defendants lack information sufficient to form a belief as to the truth of the allegations contained in the fourth sentence of paragraph 14.

15.     Paragraph 15 is denied.

16.     Defendants deny that the Directors of Operation are responsible for generating new client business or that DTZ is delivering "excellent client service," but admit the remaining allegations in Paragraph 16.

17.     Paragraph 17 is admitted.

18.     The first sentence of paragraph 18 is admitted.  The remainder of paragraph 18 is denied.

19.     Paragraph 19 is denied.

20.     Paragraph 20 is denied.

21.     Defendants admit that DTZ has had certain policies relating to purportedly "confidential" information, and deny the remainder of paragraph 21.

22.     The first sentence of paragraph 22 is denied.  Defendants lack information sufficient to form a belief as to the truth of the allegations concerning the contents of the alleged "Employee Handbook," but state that any such document speaks for itself.

1738854.1

23.     Defendants deny that DTZ distributed any "Policy of Business Conduct" to all employees in 2011.  Further answering, defendants state that they lack information sufficient to form a belief as to the truth of the allegations concerning the contents of the alleged "Policy of Business Conduct," but state that any such document speaks for itself.

24.     The first two sentences of paragraph 24 are denied.  The third and fourth sentences of paragraph 24 are admitted.  Defendants lack information sufficient to form a belief as to the truth of the allegations concerning an alleged "identity and access management solution for account provisioning/de-provisioning, user validation, and access recertification," but otherwise admit the allegations contained in the fifth sentence of paragraph 24.

25.     Defendants lack information sufficient to form a belief as to the truth of the allegations concerning the contents of the alleged "Employee Handbook," but state that any such document speaks for itself and otherwise deny paragraph 25.

26.      Defendants state that the alleged "Policy of Business Conduct" document speaks for itself, and otherwise deny paragraph 26.

27.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 27.

28.     The first sentence of paragraph 28 is denied.  Defendants state that the alleged "Contract for the Protection of Business Interests" document speaks for itself, and otherwise deny the allegations in paragraph 28.

29.     Defendants state that the alleged "Contract for the Protection of Business Interests" document speaks for itself, and otherwise deny paragraph 29.

30.     Defendants state that the alleged "Contract for the Protection of Business Interests" document speaks for itself, and otherwise deny paragraph 30.

5

31.     Defendants state that the alleged "Contract for the Protection of Business Interests" document speaks for itself, and otherwise deny paragraph 31 and footnotes 2 and 3.

32.     The first sentence of paragraph 32 is admitted.  Defendants admit that Lanzillo rose through the ranks of UNICCO but deny that he was a trusted or valued employee. Defendants admit that Lanzillo served as UNICCO's Vice President of Finance and Administration and as President of its New England and Facility Service divisions, but state that this was from 1986 to 1995, rather than for the years alleged in the third sentence of Paragraph 32.  Defendants admit that Lanzillo served as an independent consultant to UNICCO working on special company projects in 2003.  Defendants deny that Lanzillo was UNICCO's Executive President from 2004 to 2007, but admit that he was UNICCO's Vice Chairman during that time frame.  Defendants admit that UNICCO became a subsidiary of UGL in 2007, and that Lanzillo became the Chief Operating Officer for the United States and Europe in 2007.  Defendants admit that Lanzillo was the first of the former UNICCO employees to be promoted to one of the most senior positions in UGL's subsidiary United Group USA, Inc.  Defendants deny the allegation that Lanzillo was provided substantial compensation and generous benefits in that he was not provided the substantial compensation and generous benefits promised to him.  Defendants admit that Lanzillo executed a document entitled "Confidentiality, Noncompetition and Nonsolicitation Agreement," which purported to be between George Keches and the company.

33.     In response to paragraph 33, defendants state that the terms of the Confidentiality, Noncompetition and Nonsolicitation Agreement speak for themselves, and they otherwise deny paragraph 33.

1738854.1

34.     In response to paragraph 34, Defendants state that the terms of the Confidentiality, Noncompetition and Nonsolicitation Agreement speak for themselves, and they otherwise deny paragraph 34.

35.     In response to paragraph 35, Defendants state that the terms of the Confidentiality, Noncompetition and Nonsolicitation Agreement speak for themselves, and they otherwise deny paragraph 35.

36.     Defendants are unable to comprehend the first sentence of paragraph 36, and are therefore unable to answer the allegations of that sentence.  Defendants admit that UGL terminated Lanzillo's employment in April, 2011.  Defendants admit that Lanzillo signed a Separation and Release Agreement dated August 17, 2011.  In response to the remaining allegations of paragraph 36, defendants state that the terms of the Separation and Release Agreement speak for themselves and they otherwise deny paragraph 36.

37.     Defendants admit that Lanzillo established UG2 LLC in December 2012 and that the company is registered with the Massachusetts Secretary of State's office.  The terms of UG2 LLC's certificate of organization speak for themselves.  Defendants deny the third sentence of paragraph 37.  Defendants admit that Lanzillo is Chief Executive Officer of UG2.

38.     Defendants deny the allegations of paragraph 38, both directly and to the extent they incorporate other allegations contained in the First Amended Complaint.

39.     Paragraph 39 is denied.

40.     The first four sentences of paragraph 40 are admitted.  As to the fifth sentence, defendants admit that Correia possesses information concerning DTZ, but deny that such information is substantial in amount, that it is protected, confidential and proprietary, and that it belongs to DTZ.  Defendants deny the sixth sentence of paragraph 40.

41.     Defendants admit that Correia signed a "Contract for the Protection of UGL Services Unicco Operations Co.'s Business Interests" which document speaks for itself, and they otherwise deny the allegations contained in paragraph 41.

42.     Defendants admit that Correia signed a "Contract for the Protection of UGL Limited's Business Interests," which document speaks for itself, and they otherwise deny the allegations contained in paragraph 42.

43.     Defendants admit that Correia signed a "Confidentiality, Noncompetition and Nonsolicitation Agreement" which document speaks for itself, but deny that that Agreement is still valid or enforceable.

44.     As to the first sentence of paragraph 44, defendants admit only that Correia announced his resignation on or about January 31, 2013 and otherwise deny the first sentence of paragraph 44.  Defendants admit that Lanzillo and Correia communicated during the months before Correia's resignation but deny that they did so "regularly," and otherwise deny the second sentence of paragraph 44.  The third, fourth and fifth sentences of paragraph 44 are denied.  The sixth and seventh sentences of paragraph 44 are admitted.  As to the seventh sentence, defendants deny that Correia has an equity ownership interest in UG2 and lack information sufficient to form a belief as to the remainder of the sixth sentence of paragraph 44.  Paragraph 44 is otherwise denied.

45.     Paragraph 45 is denied.

46.     The first two sentences of paragraph 46 are admitted.  Defendants admit that Peterson had access to some information regarding DTZ's finances, business operations, marketing strategies, customers, sales, and customer relationships, and deny that Peterson had responsibility for, knowledge of, and access to all such information, and further deny that such

information was "critical, highly valued confidential and proprietary." The remainder of paragraph 46 is admitted.

47.     Defendants admit that Peterson signed a "Contract for the Protection of UGL Limited's Business Interests," which document speaks for itself, and they otherwise deny the allegations contained in paragraph 47.

48.     Defendants admit that Peterson signed a "Contract for the Protection of Unicco Business Interests," which document speaks for itself, and they otherwise deny the allegations contained in paragraph 48.

49.     Defendants admit that Peterson signed a "Confidentiality, Noncompetition and Nonsolicitation Agreement" which document speaks for itself but deny that that Agreement is still valid or enforceable. Defendants neither admit nor deny that they are "operating" within 100 miles of DTZ's offices as the term "operating" is ambiguous. Defendants otherwise deny the allegations contained in paragraph 49.

50.     Defendants admit that Peterson announced his resignation on January 7, 2013 and state that Peterson gave thirty (30) days' notice, but that at the request of DTZ he continued his employment until March 1, 2013. Defendants otherwise deny the allegations contained in paragraph 50.

51.     Defendants admit that Lanzillo and Peterson communicated during the months before Peterson's resignation but deny that they did so "regularly," and otherwise deny the allegations contained in the first sentence of paragraph 51. The second, third and fourth sentences of paragraph 51 are denied. The fifth sentence of paragraph 51 is admitted. As for the sixth sentence, defendants admit only that after his departure from DTZ Peterson continued to access his DTZ email account via his DTZ iPhone because of DTZ's failure to disengage his

iPhone from his DTZ email account and because, at the request of DTZ Senior Management, Peterson continued to provide assistance to DTZ on various issues.  Accordingly, defendants deny so much of the sixth sentence of paragraph 51 as alleges that Peterson's access to his DTZ email account was "without authorization," and otherwise deny the remaining allegations contained in the sixth sentence of paragraph 51.  As for the seventh sentence, Defendants admit that Peterson has a small equity interest in UG2, but lack information sufficient to form a belief as to the truth of the remainder of the seventh sentence of paragraph 51.

52.     Paragraph 52 is denied.

53.     Paragraph 53 is denied.

54.     Paragraph 54 is denied.

55.     Defendants admit that Ryan was employed by UNICCO and DTZ for more than 19 years.  Defendants admit that, prior to his departure from DTZ, Ryan was a Director of Operations in the Northeast Region.  Defendants admit that Ryan had responsibility for maintaining and retaining customer accounts and contractual relationships.  Defendants deny that Ryan had significant additional responsibilities consistent with those described in paragraph 55. Defendants admit that Ryan had responsibilities for a portfolio of educations institutions but are without information sufficient to form a belief as to the allegations that these were "highly valued" customer relationships or that they "represented substantial annual revenue for DTZ." Defendants deny that, most recently, Ryan worked under or reported to John Correia.

56.     To the extent that the allegations of paragraph 56 seek to describe a written agreement between Ryan and the plaintiff, defendants deny the allegations of paragraph 56.  In further response-to paragraph 56, defendants state that, to the extent the allegations of paragraph

10

56 refer to a legal duty, such allegations are legal, rather than factual in nature, and no response thereto is required.

57.     Defendants deny that Ryan agreed to or signed the plaintiffs' "Contract for Protection of Unicco Business Interests."  In further response to paragraph 57, defendants state that the terms of said alleged contract speak for themselves.

58.     Defendants admit that Ryan executed an agreement dated August 28, 1995 and, further answering, state that the terms of said agreement speak for themselves.

59.     In response to the allegations of paragraph 59, defendants admit that Ryan announced his resignation from DTZ on March 15, 2013.  Defendants admit that Ryan communicated with Lanzillo during the period before Ryan's departure but deny that he communicated with Correia during this time period, and deny the remainder of  the second sentence of paragraph 59.  Defendants deny the third, fourth and fifth sentences of paragraph 59. Defendants admit the sixth sentence of paragraph 59.  The remainder of paragraph 59 is denied.

60.     Defendants admit that Lezama was employed for many years by UNICCO and DTZ.  Defendants deny the remaining allegations of paragraph 60.

61.     In response to paragraph 61, Defendants admit that Lezama signed agreements in 1997, 1998 and 2000, the terms of which speak for themselves, and otherwise deny paragraph 61.

62.     Defendants admit that Lezama announced his resignation from DTZ on March 11, 2013.  Defendants admit that Lezama communicated with Lanzillo several times before his resignation and departure from DTZ, and otherwise deny the second sentence of paragraph 62. Defendants deny the third, fourth and fifth sentences of paragraph 62.  Defendants admit that

1738854.1

Lezama has begun working for UG2 as an Operations Manager.  Defendants deny the remaining allegations of paragraph 62.

63.     Defendants admit that Desaulniers began working at UGL Services on January 24, 2011, and otherwise deny the allegations contained in the first sentence of paragraph 63. Defendants admit that Desaulniers' title at UGL Services/DTZ was Operations Manager, and that he had significant responsibility for providing valuable services to several important customers, and otherwise deny the second sentence of paragraph 63.  Defendants admit that Desaulniers had business relationships with some of DTZ's customers, and otherwise deny the third sentence of paragraph 63.  Defendants admit that Desaulniers worked under and reported directly to Robert Ryan, and indirectly to John Correia, and otherwise deny the last sentence of paragraph 63.

64.     Defendants admit that Desaulniers signed a "Contract for the Protection of Unicco Business Interests," which document speaks for itself, and they otherwise deny the allegations contained in paragraph 64.

65.     The first two sentences of paragraph 65 are admitted.  Defendants admit that Desaulniers spoke to Lanzillo and, separately, to Ryan, "during the period shortly before his resignation and departure from DTZ," and otherwise deny the third sentence of paragraph 65. The fourth, fifth and sixth sentences of paragraph 65 are denied.  Defendants admit that Desaulniers will "have responsibilities for helping UG2 develop and grow its new business," and lack information sufficient to form a belief as to the remainder of the sixth sentence of paragraph 65.  The last sentence of paragraph 65 is denied.

66.     Defendants admit that Scott Burnell was employed by UNICCO/UGL Services/DTZ for approximately 14 years, and otherwise deny the first sentence of paragraph 66. The second and third sentences are denied.

67.     Defendants admit that Burnell signed a document entitled "Contract for the Protection of UGL Services Unicco Operations Co.'s Business Interests," which document speaks for itself.  Defendants otherwise deny paragraph 67.

68.     The first sentence of paragraph 68 is admitted.  The second, third, fourth and fifth sentences are denied.  As for the sixth sentence, defendants admit that Burnell "will have responsibilities for helping UG2 develop and grow its new business," and otherwise state that they lack knowledge or information sufficient to form a belief as to the truth of the remainder of the sixth sentence.  The seventh sentence is denied.

69.     Defendants admit that Janet Guisti was an employee of DTZ for more than 13 years.  They deny the remaining allegations of paragraph 69.

70.     Defendants admit that Janet Guisti executed the "Contract for Protection of Unicco Business Interests" dated January 10, 2000, the terms of which speak for themselves, and otherwise deny paragraph 70.

71.     Guisti admits that she announced her resignation from DTZ on March 15, 2013 and informed DTZ on or about March 18, 2013 that she intended to accept a position at UG2 and not to accept a different position at DTZ.  She denies the remaining allegations of paragraph 71.

72.     Paragraph 72 is denied.

73.     Defendants admit that George Doolin was a long-time employee of UNICCO and DTZ for more than 20 years.  They deny that Doolin was recruited by or hired by UG2.  They are

without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 73.

74.     Defendants admit that UG2 through Lanzillo recruited David Thompson, Paul Walsh, Tami Leverone and Michael Barboza during the time frame referenced in paragraph 74, although Ms. Leverone has provided services to DTZ, at the request of DTZ, during the same period.  They deny that Tami Drakulic is an employee of UG2 They admit that Mr. Crow was the former General Counsel of United Group, USA, Inc., but deny this was comparable in any way with being "the General Counsel for North America for DTZ Global, Inc."

75.     Paragraph 75 is denied.

76.     Paragraph 76 is denied.

77.     Paragraph 77 is denied.

78.     Defendants admit that while still employed at DTZ in January or February 2013, Correia plugged a USB device into a DTZ computer and accessed information in the performance of his job for DTZ.  The defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations that the information accessed included DTZ confidential and proprietary information.  Defendants admit that in January or February 2013 Correia plugged a second USB device into a DTZ computer to access personal information and deny that the information accessed included DTZ confidential and proprietary information. Correia does not have the USB devices in his possession, custody or control and he has complied with the Court's Orders in this matter to the fullest extent he can.  Defendants deny the remaining allegations of paragraph 78.

79.     Defendants admit that while still employed at DTZ Peterson plugged USB devices into a DTZ computer in February, 2013 and accessed information in the performance of

14

his job for DTZ.  Defendants admit that Peterson also copied to USB devices business files containing various types of DTZ information some of which may be confidential or proprietary.  Defendants deny the remaining allegations of paragraph 79.

80.     Defendants admit that Peterson used a program called "Crash Plan," to back-up the contents of his DTZ laptop computer.  They are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding the number or size of the data backed up or the date when Peterson purchased, installed, and began running the Crash Plan software.  Defendants deny the remaining allegations of paragraph 80.

81.     Defendants admit that Ryan plugged a USB drive into a DTZ computer in March, 2013 and obtained information concerning a customer that moved its business from DTZ to UGL.  He has returned all USB drives obtained during his tenure at DTZ in his possession, custody or control and has complied with the Court's Orders in this matter to the fullest extent he can; further Defendants state that the filing of this litigation was the first time DTZ requested the return of any of "its" property in Defendants' possession.  Defendants deny the remaining allegations of paragraph 81.

82.     Defendants admit that Lezama plugged a USB drive into a DTZ computer in March, 2013 and that he used a backup program NTI Backup Now EZ for several years during his employ at DTZ, during which time he routinely backed up all of his computer data, including both personal and work data.  He has returned the only USB drive obtained during his tenure at DTZ in his possession, custody or control and has complied with the Court's Orders in this matter to the fullest extent he can; further Defendants state that the filing of this litigation was the first time DTZ requested the return of any of "its" property in Defendants' possession.  Defendants deny the remaining allegations of paragraph 82.

1738854.1

83.     Defendants admit that Desaulniers plugged USB devices into a DTZ computer during the months of March and April 2013, lack knowledge or information sufficient to form a belief as to the number of such USB devices, and otherwise deny the allegations contained in the first sentence of paragraph 83.  As to the second sentence, Desaulniers lacks knowledge or information sufficient to form a belief as to the name of the backup program run on the DTZ computer, and otherwise admits the second sentence of paragraph 83.  Defendants admit that the files copied pertained to, among other things, budgets, payroll information, proposals, and customer information, and otherwise deny the third sentence of paragraph 83.  Desaulniers has returned the only USB drives obtained during his tenure at DTZ in his possession, custody or control and has complied with the Court's Orders in this matter to the fullest extent he can; further Defendants state that the filing of this litigation was the first time DTZ requested the return of any of "its" property in Defendants' possession. Defendants deny the remaining allegations of paragraph 83.

84.     Defendants admit that Burnell plugged USB drives into a DTZ computer in March and April 2013, lack knowledge or information sufficient to form a belief as to the number of such USB devices, and otherwise deny the first sentence of paragraph 84.  Defendants admit that one such USB contains the data files on the DTZ computer, and otherwise deny the second sentence of paragraph 84.  Defendants admit that the files copied pertained to, among other things, budgets, payroll information, proposals, and customer information, and otherwise deny the third sentence of paragraph 84.  Burnell has returned the only USB drives obtained during his tenure at DTZ in his possession, custody or control and has complied with the Court's Orders in this matter to the fullest extent he can; further Defendants state that the filing of this

litigation was the first time DTZ requested the return of any of "its" property in Defendants' possession. Defendants deny the remaining allegations of paragraph 84.

85.     Defendants admit that Guisti plugged USB drives into DTZ computers during February and March, 2013.  She has returned any USB drives obtained during her tenure at DTZ in her possession custody or control and has complied with the Court's Orders in this matter o the fullest extent she can;  further Defendants state that the filing of this litigation was the first time DTZ requested the return of any of "its" property in Defendants' possession. Defendants deny the remaining allegations of paragraph 85.

86.     Paragraph 86 is denied.

87.     Defendants admit that Peterson and Guisti while still employed at DTZ began using UG-2 email accounts.  Paragraph 87 is denied to the extent that any e-mails between Guisti and Peterson, including those sent to or from UG2. com, are characterized in the manner so characterized.

88.     Defendants admit that before and after his employment with DTZ had terminated, Peterson also used a personal email account, with the domain name "@gmail.com".  Defendants deny the remaining allegations of paragraph 88.

89.     Paragraph 89 is denied.

90.     Defendants admit that before and after his employment with DTZ had terminated, Burnell used a personal email account with the domain name "@comcast.net" to send messages and attachments to himself, and deny the remaining allegations of paragraph 90.

91.     Defendants admit that after his employment with DTZ had terminated and after he had begun working for UG2, Peterson accessed his previous DTZ email account via his DTZ iPhone where DTZ's failed to disengage his DTZ iPhone from his DTZ email account.

1738854.1

Defendants state that after he left employment at DTZ, at the request of DTZ Senior Management, Peterson continued to provide assistance to DTZ on various issues, and deny that access to his DTZ email account was "without authorization." Defendants admit that Guisti and Peterson exchanged e-mails after he had commenced employment at UG2 and she was employed at DTZ. To the extent any such e-mails are quoted in paragraph 92, the terms of said e-mails speak for themselves. Defendants deny the remaining allegations of paragraph 91.

92.     Defendants admit that after his employment with DTZ had terminated and after he had begun working for UG2, Peterson accessed his previous DTZ email account via his DTZ iPhone where DTZ's failed to disengage his DTZ IPhone from his DTZ email account. Defendants state that after he left employment at DTZ, at the request of DTZ Senior Management, Peterson continued to provide assistance to DTZ on various issues, and deny that access to his DTZ email account was "without authorization." Peterson does not recall forwarding any email message and attachment to Lanzillo and Correia and the allegation that he did so is therefore denied. Defendants deny the remaining allegations of paragraph 92.

93.     As to the first sentence of paragraph 93, defendants admit that Burnell and Lezama accessed DTZ's computer "Portal" network but deny that such access was "without authorization." Peterson does not recall accessing DTZ's Computer Portal and the allegation that he did so is therefore denied. Defendants state that after he left employment at DTZ, at the request of DTZ Senior Management, Peterson continued to provide assistance to DTZ on various issues, and deny that access to DTZ's computer Portal, if any, was "without authorization." As to the third sentence, defendants admit that Lezama and Burnell accessed DTZ's Portal after joining UG2 on one occasion each, but state that they did so with authorization. The fourth sentence is admitted. As to the fifth sentence, defendants admit that a user who accesses Portal

may have access to email, business documents, customer information, invoices, policies and procedures, but deny that any information accessible via Portal is "highly confidential and proprietary information."   The sixth and seventh sentences are denied.

94.     Defendants admit that they returned DTZ paper documents to DTZ pursuant to the Stipulated Preliminary Injunction Order and that the documents comprise several thousand pages; further Defendants state that the filing of this litigation was the first time DTZ requested the return of any of "its" property in Defendants' possession. Further answering, the Defendants state that the documents contained in the boxes speak for themselves, and otherwise deny the allegations contained in paragraph 94.

95.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning an unidentified DTZ customer mentioned in paragraph 95. Defendants deny the remaining allegations of paragraph 95.

96.     Defendants deny the first and second sentences of paragraph 96.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in the third sentence of paragraph 96.

97.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning the unidentified DTZ customers mentioned in paragraph 97.

98.     Defendants admit only that since February 2013, Lanzillo has tried to obtain business from customers that may include DTZ customers, and otherwise deny the allegations contained in paragraph 98.

99.     Paragraph 99 is denied.

100.     Paragraph 100 is denied.

1738854.1

101.    Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in the first sentence of paragraph 101.  Defendants deny the allegations in the second and third sentences of paragraph 101.

102.    The first sentence of paragraph 102 states a legal conclusion to which no response is required.  To the extent a response is required, the factual allegations contained in the first sentence of paragraph 102 are denied.  Defendants state that the referenced registrations speak for themselves and no further response to the second, sentence of paragraph 102 is required.  Defendants deny that the UGL logo mark is distinctive, and otherwise states that the registration referenced in the third sentence speaks for itself.  The fourth and fifth sentences are admitted.  Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the sixth sentence of paragraph 102, except that it denies that DTZ has the authority to enforce the reference names and trademarks.  The seventh sentence of paragraph 102 is denied.

103.    Paragraph 103 is denied.

104.    Paragraph 104 is denied.

105.    Defendants deny that UG2's name, mark and logo are confusingly similar to UGL or the UGL Logo; further deny that UG2's name mark and logo are "infringing," and otherwise admit the allegations contained in paragraph 105.

106.    Defendants state that UG2's website speaks for itself, and otherwise deny the characterizations of the website contained in the first two sentences of paragraph 106.  The third sentence is denied.  Defendants deny the remaining allegations of paragraph 106.

107.    Defendants state that its logo speaks for itself, and otherwise deny the allegations contained in paragraph 107.

108.    Paragraph 108 is denied.

1738854.1

109.    Paragraph 109 is denied.

110.    Paragraph 110 is denied.

111.    Defendants state that the letter referenced in paragraph 111 speaks for itself, and otherwise deny the first sentence of paragraph 111, including its implication that plaintiff owns the trademarks at issue.  Defendants admit that UG2 continues to use the UG2 name, mark and logo, and otherwise deny the allegations contained in the second sentence of paragraph 111.

112.    Paragraph 112 is denied.

## COUNT I

**Violation of the Computer Fraud and Abuse Act – Against All Defendants**

113.    The responses to paragraphs 1 through 112 are hereby incorporated by reference as if fully set forth herein.

114.    The first sentence of paragraph 114 is denied.  The second sentence states a legal conclusion to which no response is required.

115.    Paragraph 115 is denied.

116.    Paragraph 116 is denied.

117.    Paragraph 117 is denied.

118.    Paragraph 118 is denied.

119.    Defendants deny that DTZ is entitled to any recovery under the CFAA.

120.    Paragraph 120 is denied.

Defendants deny that DTZ is entitled to judgment, damages or injunctive relief on Count I of its first amended complaint.

1738854.1

## COUNT II

**Breach of Contract**

**Against Defendants Correia, Peterson, Ryan, Lezama, Desaulniers and Burnell and Guisti**

121.     The responses to paragraphs 1 through 120 are hereby incorporated by reference as if fully set forth herein.

122.     Paragraph 122 is denied.

123.     Paragraph 123 is denied.

124.     Paragraph 124 is denied.

Defendants deny that DTZ is entitled to judgment, damages or injunctive relief on Count II of its first amended complaint.

## COUNT III

**Breach of the Confidentiality, Noncompetition and Nonsolicitation Agreement Against Defendants Lanzillo, Correia, and Peterson**

125.     The responses to paragraphs 1 through 125 are hereby incorporated by reference as if fully set forth herein.

126.     Paragraph 126 is denied.

127.     Paragraph 127 is denied.

128.     Paragraph 128 is denied.

Defendants deny that DTZ is entitled to judgment, specific performance, damages or injunctive relief on Count III of its first amended complaint.

1738854.1

## COUNT IV

**Misappropriation of Proprietary and Confidential Information
and Trade Secrets Against All Defendants**

129.    The responses to paragraphs 1 through 128 are hereby incorporated by reference as if fully set forth herein.

130.    Paragraph 130 is denied.

131.    Paragraph 131 is denied.

132.    Paragraph 132 is denied.

Defendants deny that DTZ is entitled to judgment, damages or injunctive relief on Count IV of its first amended complaint.

## COUNT V

**Conversion Against All Defendants**

133.    The responses to paragraphs 1 through 132 are hereby incorporated by reference as if fully set forth herein.

134.    Paragraph 134 is denied.

135.    Paragraph 135 is denied.

136.    Paragraph 136 is denied.

137.    Paragraph 137 is denied.

Defendants deny that DTZ is entitled to judgment, damages or any other relief on Count IV of its first amended complaint.

## COUNT VI

### Breach of Fiduciary Duties

### Against Correia, Peterson, Ryan, Lezama, Desaulniers, Burnell, and Guisti

138.    The responses to paragraphs 1 through 137 are hereby incorporated by reference as if fully set forth herein.

139.    Paragraph 139 is denied.

140.    Paragraph 140 is denied.

Defendants deny that DTZ is entitled to judgment, damages or injunctive relief on Count V of its first amended complaint.

## COUNT VII

### Civil Conspiracy Against All Defendants

141.    The responses to paragraphs 1 through 140 are hereby incorporated by reference as if fully set forth herein.

142.    Paragraph 142 is denied.

143.    Paragraph 143 is denied.

144.    Paragraph 144 is denied.

145.    Paragraph 145 is denied.

Defendants deny that DTZ is entitled to judgment, damages or injunctive relief on Count VII of its first amended complaint.

## COUNT VIII

### Aiding and Abetting Breach of Fiduciary Duty

### Against UG2, Lanzillo, Correia, and Peterson

146.     The responses to paragraphs 1 through 145 are hereby incorporated by reference as if fully set forth herein.

147.     Paragraph 147 is denied.

148.     Paragraph 148 is denied.

149.     Paragraph 149 is denied.

150.     Paragraph 150 is denied.

Defendants deny that DTZ is entitled to judgment, damages or injunctive relief on Count VIII of its first amended complaint.

## COUNT IX

### Interference With Contractual Relations Against All Defendants

151.     The responses to paragraphs 1 through 150 are hereby incorporated by reference as if fully set forth herein.

152.     Paragraph 152 is denied.

153.     Paragraph 153 is denied.

154.     Paragraph 154 is denied.

155.     Paragraph 155 is denied.

Defendants deny that DTZ is entitled to judgment, damages or injunctive relief on Count IX of its first amended complaint.

1738854.1

## COUNT X

### Inducement of Breach of Contract

### Against UG2, Lanzillo, Correia, and Peterson

156.    The responses to paragraphs 1 through 155 are hereby incorporated by reference as if fully set forth herein.

157.    Paragraph 157 is denied.

158.    Paragraph 158 is denied.

159.    Paragraph 159 is denied.

160.    Paragraph 160 is denied.

161.    Paragraph 161 is denied.

Defendants deny that DTZ is entitled to judgment, damages or injunctive relief on Count X of its first amended complaint.

## COUNT XI

### Tortious Interference with Business Expectancy

### Against All Defendants

162.    The responses to paragraphs 1 through 161 are hereby incorporated by reference as if fully set forth herein.

163.    Paragraph 163 is denied.

Defendants deny that DTZ is entitled to judgment, damages or injunctive relief on Count XI of its first amended complaint.

1738854.1

## COUNT XII

### Intentional Interference with Advantageous Business Relations
### Against All Defendants

164.    The responses to paragraphs 1 through 163 are hereby incorporated by reference as if fully set forth herein.

165.    Paragraph 165 is admitted.

166.    Paragraph 166 is denied.

167.    Paragraph 167 is denied.

168.    Paragraph 168 is denied.

Defendants deny that DTZ is entitled to judgment, damages or injunctive relief on Count XII of its first amended complaint.

## COUNT XIII

### Federal Trademark Infringement – 15 U.S.C. § 1114

### Against UG2

169.    The responses to paragraphs 1 through 168 are hereby incorporated by reference as if fully set forth herein.

170.    UG2 denies all allegations in paragraph 170, including but not limited to the allegation that plaintiff has any enforceable "rights" in the marks and logo at issue.

171.    Paragraph 171 is denied.

172.    Paragraph 172 is denied.

173.    Paragraph 173 is denied.

Defendant UG2 denies that plaintiff is entitled to judgment, damages, attorneys' fees, or any other relief under Count XIII of the first amended complaint.

1738854.1

## COUNT XIV

### Common Law Trademark Infringement and Unfair Competition

### Against UG2

174.    The responses to paragraphs 1 through 173 are hereby incorporated by reference as if fully set forth herein.

175.    Paragraph 175 is denied.

176.    Paragraph 176 is denied.

177.    Paragraph 177 is denied.

Defendant UG2 denies that plaintiff is entitled to judgment, damages, or any other relief on Count XIV of its first amended complaint.

## COUNT XV

### False Designation of Origin and Unfair Competition – 15 U.S.C. §1125

### Against UG2

178.    The responses to paragraphs 1 through 177 are hereby incorporated by reference as if fully set forth herein.

179.    Paragraph 179 is denied.

180.    Paragraph 180 is denied.

Defendant UG2 denies that plaintiff is entitled to judgment, damages, attorneys' fees or any other relief on Count XV of its first amended complaint.

## COUNT XVI

### Unjust Enrichment

### Against UG2

181.    The responses to paragraphs 1 through 180 are hereby incorporated by reference as if fully set forth herein.

182.    Paragraph 182 is denied.

Defendant UG2 denies that plaintiff is entitled to judgment, damages, or any other relief on Count XVI of its first amended complaint.

### COUNT XVII

### Violation of M.G.L. c. 93A, § 11

### Against UG2, Lanzillo, Correia, and Peterson

183.    The responses to paragraphs 1 through 182 are hereby incorporated by reference as if fully set forth herein.

184.    Paragraph 184 states a legal conclusion to which no response is required.

185.    Paragraph 185 states a legal conclusion to which no response is required.

186.    Paragraph 186 is denied.

Defendants deny that DTZ is entitled to judgment, damages, injunctive relief, or attorneys' fees on Count XVII of its complaint.

### COUNT XVIII

### Injunctive Relief Against All Defendants

187.    The responses to paragraphs 1 through 186 are hereby incorporated by reference as if fully set forth herein.

188.    Paragraph 188 is denied.

Defendants deny that DTZ is entitled to judgment, damages, injunctive relief, or attorneys' fees on Count XVIII of its complaint.

### AFFIRMATIVE DEFENSES

1.    DTZ's claims are barred because the alleged agreements are unreasonable and contrary to public policy in that, among other things, they purport to protect supposedly confidential or proprietary information that DTZ has taken no reasonable measures to protect;

some or most of the supposedly confidential or proprietary information has been placed in the public domain by DTZ's unrestricted disclosure of same to customers and potential customers; the agreements are broader than necessary to protect any legitimate business interest of DTZ; and the agreements pose an undue hardship on the persons allegedly restricted.

2.      DTZ's claims are barred because the alleged agreements do not protect DTZ's protectable trade secrets, confidential business information, or customer goodwill.

3.      DTZ's claims are barred because DTZ committed breaches of contract and/or violated the implied duty of good faith and fair dealing by, among other things, failing to pay bonuses and/or other compensation promised to its employees.

4.      DTZ's claims are barred because the agreements were either not executed or were improperly executed.

5.      DTZ's claims are barred because the alleged agreements lack proper consideration.

7.      DTZ's claims are barred because any rights in the alleged agreements were not properly assigned to the plaintiff by its predecessor(s) in interest.

8.      DTZ's claims are waived because of, among other things, its failure to treat or maintain information confidentially as evidenced by its practice of a) allowing departing employees to retain DTZ property and b) sharing company information with former employees who are working for competitors.

9.      DTZ's claims are barred because the alleged agreements have expired, been rescinded or superseded, or otherwise rendered unenforceable, without limitation, by agreement or by virtue of changes to the former employees' job duties.

10.     DTZ's claims are barred by estoppel.

11.     DTZ's claims for equitable relief are barred by its own unclean hands because, among other things, of its failure to adhere to employment agreements concerning the payment of bonuses and other compensation to the former employees.

12.     DTZ's claims are barred by the doctrine of laches because of its unreasonable delay in seeking relief.

13.     DTZ's first amended complaint fails to state a claim upon which relief may be granted.

14.     DTZ's claims are barred in whole or in part by its failure to mitigate its damages.

15.     DTZ's claim under Mass. Gen. Laws c. 93A is barred because the alleged actions did not take place in trade or commerce since, among other things, the alleged acts took place in the course of an alleged employment relationship.

16.     DTZ's claims fail because the court lacks subject matter jurisdiction.

17.     DTZ's claims fail for lack of standing.

18.     The alleged marks and logos at issue are not distinctive and have not acquired secondary meaning.

19.     DTZ's claims are barred by DTZ's failure to use and enforce the alleged marks and logos at issue.

20.     DTZ's claims are barred by DTZ's abandonment of the alleged marks and logos at issue.

**COUNTERCLAIMS**

I.     **Parties**

1)     Counterclaim plaintiff, UG2 LLC ("UG2") is a Massachusetts Limited Liability Company with a principal place of business in Boston, Suffolk County, Massachusetts.

31

2)      Counterclaim plaintiff, Louis Lanzillo ("Lanzillo") is an individual resident of Weston, Middlesex County, Massachusetts.  He is the founder and Chief Executive Officer of UG2.  He formerly served as a senior executive at Unicco, a facilities management company that was purchased by United Group Ltd., in 2007.  United Group Ltd. changed its name in 2009 to UGL Ltd.  Subsequently, he worked as a senior executive for UGL Ltd.'s subsidiary United Group USA, until his employment was terminated without cause in 2011.

3)      Counterclaim plaintiff, John Correia ("Correia") is an individual resident of Arlington, Middlesex County, Massachusetts. He was employed by Unicco and its successor companies for 32 years, rising through the company's ranks until he became Vice President of Operations for the East Region.  He is currently employed by UG2.

4)      Counterclaim plaintiff, Jeffrey Peterson ("Peterson") is an individual resident of Wellesley, Norfolk County, Massachusetts.  He was employed by Unicco and its successor companies for approximately 14 years.  He is currently employed by UG2.

5)      Counterclaim plaintiff, Robert Ryan ("Ryan") is an individual resident of Roslindale, Suffolk County, Massachusetts.  He was employed by Unicco and its successor companies for approximately 19 years.  He is currently employed by UG2.

6)      Counterclaim plaintiff, Armando Lezama ("Lezama") is an individual resident of Salem, Essex County, Massachusetts.  He was employed by Unicco and its successor companies on two separate occasions, with the most recent employment tenure being of approximately seven years duration.  He is currently employed by UG2.

7)      Counterclaim plaintiff, Robert Desaulniers ("Desaulniers") is an individual resident of Sudbury, Massachusetts.  He was employed by Unicco and its successor companies. He is currently employed by UG2.

8)     Counterclaim plaintiff, Scott Burnell ("Burnell") is an individual resident of Lunenburg, Worcester County, Massachusetts.  He was employed by Unicco and its successor companies.  He is currently employed by UG2.

9)     Counterclaim defendant, DTZ, Inc., is a Massachusetts corporation with a place of business in Newton, Middlesex County, Massachusetts, and headquarters in Los Angeles, California.

10)    Counterclaim defendant, UGL Ltd., is an Australian corporation and parent corporation to DTZ, Inc., with a head office in North Sydney, New South Wales.  It is joined herein as a necessary party to Count Six of these counterclaims.

11)    Counterclaim defendant Antonio Andrade is an individual resident of 2400 Beacon Street, #306, Chestnut Hill, MA 02467, Massachusetts.  He is employed by defendant-in-counterclaim DTZ, Inc. as its Vice President of Operations.  He was employed by Unicco and its successor companies for approximately 22 years.  He is joined herein as a necessary party to this counterclaim.

**Facts Common to All Counts**

12)    In 2007, Unicco, then a facilities management and services business headquartered in Massachusetts, was purchased by United Group Ltd., later known as UGL Ltd. ("UGL"), a global conglomerate headquartered in Australia.

13)    Commencing in or about 2002 and continuing through 2012, UGL acquired a number of commercial real estate and facilities services businesses around the world.  These included Equis, a Chicago-based commercial real estate business, KFPW, an Australian property service business, and Kilpatrick Green, an Australian-based facility service provider, Premas, a

Singapore-based facility services business, and DTZ, a London-based commercial real estate business.

14)     In September 2012, UGL branded these acquisitions in the commercial real estate and facilities services businesses as "DTZ."  In a press release dated September 4, 2012, UGL's Managing Director and CEO Richard Leupen stated, "From today, our property services business will be recognised globally as DTZ."

15)     In 2013, UGL dropped reference to the UGL name with respect to its commercial real estate and facilities services businesses and recast its business as "DTZ."

16)     After UGL began acquiring commercial real estate and facilities services businesses, it increasingly sought to run its global property services businesses from Australia. However, in 2011, it determined, given the insignificant share of global property service business revenues derived from operations in Australia, that it would site DTZ's Global Property Service Unit ("GPSU") in Los Angeles, California.

17)     Despite the fact that DTZ had relatively little property services business in Los Angeles, UGL directed the GPSU to hire a large number of senior managers to staff its operations, including senior executives, new chief legal counsel, a new head of Human Resources, a new head of sales and a new head of marketing.

18)     As a result of UGL and DTZ's shift of geographic emphasis for its property services work to Los Angeles, long-time employees of the former Unicco, working in the Boston (Massachusetts) region, suffered steadily diminishing authority and autonomy.

19)     Increasingly, authority that previously had been delegated to senior managers diminished, and then was removed altogether.  For example, senior executives were deprived of

the ability to hire or fire any employees, including their own assistants, without permission from GPSU.

20)    In the same vein, senior executives were not allowed to undertake even minimal travel without pre-approval.  For example, John Correia, a Vice President for Operations in the East Region, was forbidden from traveling from Boston to Buffalo, NY without express permission from the GPSU.

21)    Senior executives who had the discretion to enter into contracts with vendors and customers found their authority to do so had been rescinded.

22)    In addition to this demoralizing loss of authority, former Unicco senior managers learned that UGL was seeking to deemphasize the company's facilities management and services business and had entered merger or acquisition discussions with national and global commercial real estate firms toward that end.  UGL's stated objective was to be one of the top 3 global real estate firms along with Jones Lang LaSalle and CBRE, which were two of the former Unicco's largest customers.

23)    As a result of this shift in emphasis, a number of significant long-time customers of the Boston-based DTZ office, those commercial real estate companies that were long-time Unicco clients, informed their former Unicco facilities managers that they would no longer enter into contracts with UGL-owned companies, such as DTZ, as they regarded UGL as a competitor in the commercial real estate field.

24)    The prospect of losing business, coupled with steadily declining authority and autonomy threatened not only the ability of the individual counterclaim plaintiffs to perform their jobs, but threatened their very livelihoods.

35

25)     The threat posed to the individual counterclaim plaintiffs by UGL and GPSU's decision to de-emphasize their company's facilities management business became more critical in 2012, when they became aware that UGL had entered discussions to "de-merge" with DTZ.

26)     To position DTZ for prospective sale, and to counter the tremendous costs that UGL had incurred in establishing GPSU, UGL initiated efforts to reduce senior management levels at the former Unicco, to reduce staffing generally, and to reduce other operating costs in North America. The codename that DTZ gave to this cost cutting program was "Project Columbus."

27)     UGL representatives openly and disparagingly referred to former Unicco senior managers as "legacy" managers and undertook an effort to reduce their number on several fronts, including pressuring older Unicco "legacy" employees to retire, the outright termination without cause older "legacy" managers and executives, and instructing its executives, including but not limited to defendant John Correia, that the company wanted to hire and promote younger managers and executives.

28)     Foremost among the efforts to reduce the number of facilities management "legacy" managers was the reduction, and then elimination of long-promised merit pay increases and the failure to fund bonus incentives for its employees.

29)     UGL's need to cut costs in its facilities maintenance business, as well its desire to "de-merge" with DTZ, was heightened by its significant losses from improvident fixed price contracts in its engineering and resource businesses.  On May 15, 2013, UGL lowered guidance from $150-160M of underlying profit to $90-100M of underlying profit for the fiscal year ended June 30, 2013.  UGL's stock price has dropped precipitously from a high of $21 in 2007 to below $7 today.

30)     UGL's financial problems, its decision to emphasize commercial real estate business (including leasing and property management) over the facilities management and services business, its decision to center management of its property business in Los Angeles, its public courting of a merger with national and global real estate services companies, its public announcement of its intention to "de-merge" with DTZ, and its aggressive reduction of personnel and other costs and benefits in North America, created an air of instability and uncertainty at DTZ's former Unicco office in Boston.

31)     The pervasive atmosphere of instability and uncertainty at DTZ's former Unicco offices during 2012 and early 2013 was exacerbated by the loss, to DTZ's senior facilities management personnel at DTZ, of their autonomy, decision making authority and incipient loss of business owing to the company's shift in emphasis.

32)     In late 2012, senior managers were apprised, in a two line e-mail, that they would not be paid the merit pay increases that they had been assured they would receive. Indeed, the day before the pay increases were due in employees' paychecks, the company announced it was pulling the plug on the pay increases.

33)     Shortly thereafter, employees learned that their performance bonuses, which were tied to specific performance metrics, would not be paid in accordance with the stated performance metrics. Each of counterclaim plaintiffs Correia, Peterson, Ryan, Lezama, Desaulniers and Burnell satisfied the performance criteria to earn a full bonus under the 2011 and 2012 Bonus Plan but DTZ failed to budget or reserve funds to pay out the full amount of the bonuses and ultimately paid these counterclaim plaintiffs only a fraction of the bonuses that they had earned in breach of the terms of the 2011 and 2012 Bonus Plans.  UGL and DTZ senior executives dictated that the sole criteria for the award of the 2012 limited bonuses was the

company's desire to retain certain managers and the perceived risk of losing specific managers which it wanted to retain.

34)   The decision not to pay merit increases, as well as the decision not to pay performance bonuses based upon performance metrics was made or approved by UGL's Managing Director and Chief Executive Officer Richard Leupen ("Leupen").

35)   In early 2013, Leupen dispatched Paul Long ("Long") from UGL to meet with senior management at DTZ's Boston office to address what UGL perceived to be widespread morale problems in the Boston office.

36)   Long met with senior managers on an individual basis over a four day period in early 2013, and then met with the managers as a group. He told the group that he would report his findings to Richard Leupen.  Also, upon information and belief, Michael Dunn, a DTZ senior vice president, prepared a multi-page report detailing the reasons (including DTZ's and UGL's actions and failures to act) that had contributed to a disastrous decline in morale at DTZ, the loss of key management, significant ill-will and distrust between the former UNICCO leadership and UGL's and DTZ's leadership.

37)   In late 2012, several demoralized senior DTZ executives left to take positions with other DTZ competitors (not UG2).  This list included, but not limited to, David Giamichael, Mo Scigliano, and Eric Miller.

38)   In 2013, a number of former Unicco senior managers had decided to leave the company, including Correia, Peterson, Ryan, Lezama, DeSaulniers and Burnell.

39)   Each of them, acting individually and without consulting in concert, spoke to Lanzillo, and learned that he had begun a facilities services company.

40)      Each of them, acting individually and without consulting in concert, decided to join UG2 as employees.

41)      When Lanzillo began UG2 in December of 2012, after the expiration of certain restrictive covenants, he also had several discussions with Andrade regarding Andrade becoming a member of UG2's leadership team and having an equity interest in the Company.

42)      Andrade expressed a strong desire to leave his employment at DTZ and join UG2.

43)      In December of 2012 or January of 2013, Lanzillo offered Andrade a position at UG2 as Senior Operations Manager at substantial salary and offered an equity participation in the Company.

44)      Andrade countered Lanzillo's offer and asked for a larger salary and a greater equity stake in UG2.  Lanzillo was unwilling to meet Andrade's demands and broke off negotiations.

45)      After negotiations were broken off, Andrade contacted defendant John Correia. Andrade told Correia that he had been trying to contact Lanzillo; that Lanzillo had made him an offer to join UG2 which included equity in UG2 and that he had made a counter-offer to Lanzillo. Andrade threatened that if Lanzillo did not make a deal with him, he would take every opportunity to do whatever he could to make life "f***ing miserable" for Lanzillo and UG2, including underpricing UG2, and initiating a lawsuit against UG2, Lanzillo and other former DTZ employees to drive UG2 out of business.

46)      Subsequently, as UG2 has worked to develop its facilities services business, it has encountered potential customers who have disclosed to them that Andrade, among other DTZ managers, has falsely told the prospective customers, among other things:

    a)  "Don't do business with UG2, they will soon be out of business";

b)  "Don't talk to UG2, we're going to drive them out of business;

c)  "Don't do business with UG2, they are in financial straits and cannot make payroll";

d)  "We're suing UG2 and will put them out of business. "

47)    Andrade made these statements with the improper motive and improper means of punishing UG2 and Lanzillo for refusing to agree to give Andrade the salary and equity stake he demanded in UG2.  Andrade and other DTZ employees made these statements without privilege to do so.

48)    In addition, DTZ has been distributing copies of this lawsuit to its and UG2's customers, and saying that the suit is going to shut down UG2.  DTZ has also been engaging in predatory pricing practices by bidding jobs below cost in order to drive UG2 out of the market, or create barriers to entry for UG2.

## COUNT ONE

### INTENTIONAL INTERFERENCE WITH UG2's ADVANTAGEOUS RELATIONS (AGAINST DTZ AND ANDRADE)

49)    Counterclaim plaintiff UG2 repeats the allegations of paragraphs 1 through 48 of its Counterclaim and incorporates them by reference as if fully set forth herein.

50)    DTZ and Andrade have intentionally interfered with UG2's efforts to obtain prospective customers by making statements that they knew to be false, or without concern for the truth or falsity of such statements, concerning UG2's financial viability.

51)    DTZ made such statements for the purpose of depriving UG2 of the prospect of entering into advantageous and/or contractual relationships with its prospective customers.

52)    Andrade made such statements for the improper purpose of punishing UG2 for refusing to accede to Andrade's demands for a larger compensation package and an equity stake in UG2.

40

53)     The intentional interference by DTZ and Andrade has caused UG2 damage to its business reputation, economic damage in the form of lost prospective customer relationships and irreparable harm.

## COUNT TWO

### DEFAMATION OF UG2
### (AGAINST DTZ AND ANDRADE)

54)     Counterclaim plaintiff UG2 repeats the allegations of paragraphs 1 through 53 of the Counterclaims and incorporates them by reference as if fully set forth herein.

55)     As described in paragraph 46 above, DTZ and Andrade published false and defamatory statements of and concerning UG2.

56)     The statements described in paragraph 46 above did not involve matters of public concern.

57)     DTZ and Andrade acted negligently when making the statements described in paragraph 46.

58)     DTZ and Andrade published the statements described in paragraph 46 in bad faith, with express malice, and with the intention of harming UG2's reputation.

59)     In publishing the statements described in paragraph 46 above, DTZ and Andrade engaged in willful, wanton, and intentional misconduct.

60)     DTZ and Andrade published the statements described in paragraph 46, above, with knowledge that the statements were false, and/or with reckless disregard for their truth or falsity.

61)     The publication of the defamatory statements described in paragraph 46 has caused UG2 to suffer significant injury including, without limitation, harm to reputation.

41

62)     The false and defamatory statements described in paragraph 46 prejudiced UG2 in the conduct of its business and, on information and belief, deterred others from dealing with it. The statements of DTZ and Andrade have a direct tendency to alienate customers and injure UG2 in its business and profession.

63)     The false and defamatory statements of DTZ and Andrade have caused UG2 damage to its business reputation,  economic damage and irreparable harm.

## COUNT THREE

### INJURIOUS FALSEHOOD/COMMERCIAL DISPARAGEMENT OF UG2 (AGAINST DTZ AND ANDRADE)

64)     Counterclaim plaintiffs repeat the allegations of paragraphs 1 through 63 of the Counterclaims and incorporate them by reference as if fully set forth herein.

65)     As described in paragraph 46 above, DTZ, Andrade, and other employees working for and under the direction of the DTZ, published false statements harmful to the interests of UG2.

66)     DTZ and Andrade intended for publication of the statements to result in harm to the interests of UG2 having a pecuniary value, or DTZ and Andrade recognized or should have recognized that the statements were likely to do so.  DTZ and Andrade knew that the statements were false or acted in reckless disregard of their truth or falsity.

67)     The false and injurious statements of DTZ and Andrade have caused UG2 pecuniary damage, harm to its reputation and irreparable harm.

## COUNT FOUR

## UG2's CLAIM AGAINST DTZ AND ANDRADE FOR VIOLATION OF
## M.G.L. c. 93A, §11

68)     Counterclaim plaintiffs repeat the allegations of paragraphs 1 through 67 of the

Counterclaim and incorporate them by reference as if fully set forth herein.

69)     DTZ and Andrade have engaged in a pattern of unfair and deceptive trade

practices and unfair methods of competition.  In particular, DTZ's and Anrade's unfair and

deceptive trade practices and unfair methods of unfair competition include, but are not limited

defendant's and/or its agents' statements that UG2 would soon be out of business and that UG2

had failed to meet its payroll, and predatory pricing practices intended to drive UG2 out of the

market, or create barriers to entry for UG2.

70)     DTZ's and Andrade's statements and above-described conduct were intended to

harm UG2's prospects of obtaining business.  In making the false statements described in

paragraph 46 above, DTZ and Andrade knew them to be untrue or made them without regard to

their truth or falsity.

71)     These concerted and repeated efforts to harm UG2's business prospects constitute

unfair and deceptive trade practices and unfair methods of competition in violation of M.G.L. c.

93A.  DTZ's and Andrade's unfair and deceptive trade practices and unfair methods of

competition have been willful and knowing.

72)     The unfair and deceptive trade practices have  occurred primarily and

substantially within the Commonwealth of Massachusetts.

73)     The unfair and deceptive practices have caused UG2 damage to its business

reputation, economic damage and irreparable harm.

## COUNT FIVE

## CORREIA, PETERSON, RYAN, LEZAMA, DESAULNIERS AND BURNELL vs. DTZ BREACH OF CONTRACT

74)      Counterclaim plaintiffs repeat the allegations of paragraphs 1 through 73 of the Counterclaim and incorporate them by reference as if fully set forth herein.

75)      Correia, Peterson, Ryan, Lezama, Desaulniers, and Burnell each were eligible recipients of DTZ's Corporate Leadership Bonus Incentive Plan ("the Bonus Plan").

76)      DTZ informed the DTZ employees eligible for the FY2011 and FY2012 Bonus Plans that, if they met one hundred percent of their performance metrics, $3,500,000 (Three Million Five Hundred Thousand Dollars) of bonus payment would be paid to them.

77)      DTZ budgeted less than one half that amount to fund its 2011 and its 2012 Bonus Plan, and never had any intention of paying the full bonus even if employees fully met the performance metrics set by the company.

78)      For example, for FY 2012, DTZ paid bonuses only to those recipients who it regarded as posing a "flight risk" (i.e., a risk to leave DTZ to join a competitor), contrary to the Bonus Plan, and did not make payments under the Bonus Plan based upon specific performance metrics, as it had represented.

79)      Upon information and belief, the company met its threshold metrics under the bonus plans, and therefore bonus payments were due to employees who met their individual bonus metrics. Each of counterclaim plaintiffs Correia, Peterson, Ryan, Lezama, and Burnell satisfied their individual bonus criteria to earn a full bonus under the 2011 and 2012 Bonus Plan

80)      DTZ failed and refused to pay these counterclaim plaintiffs the full bonuses to which their performance metrics entitled them for 2011 and 2012, all in breach of the terms of the 2011 and 2012 Bonus Plans.

81)     Correia, Peterson, Ryan, Lezama, Desaulniers and Burnell have incurred financial harm as a result of DTZ's breach of the terms of its Bonus Plans.

82)     Correia, Ryan, Lezama, and Burnell were assured they would receive merit pay increases in October 2012.  The day before the pay increases were due in employees' paychecks, DTZ announced it was pulling the plug on the pay increases.  In that DTZ pays its employees in arrears, Correia, Ryan, Lezama, and Burnell were all illegally deprived of additional compensation which they had been promised and had earned.

83)     Correia, Ryan, Lezama, and Burnell have incurred financial harm as a result of DTZ's illegal detention of their wages described in paragraph 82 above.

## COUNT SIX

### BREACH OF CONTRACT
### (AGAINST UGL LIMITED)

84)     Lanzillo repeats the allegations of paragraphs 1 through 83 of the Counterclaims and incorporate them by reference as if fully set forth herein.

85)     In April, 2011, Lanzillo, was terminated from his employment without cause.

86)     At the time of Lanzillo's termination, Paul Long, who was then Chief Administrative Officer for UGL Limited, told another UGL executive that UGL had no intention of paying Lanzillo the amounts of shares and bonuses to which he was entitled.

87)     Months later, the terms of Lanzillo's separation were embodied in a Separation and Release Agreement ("the Agreement"), which DTZ expressly relies upon for its claims against Lanzillo. A true and accurate copy of the Agreement is appended hereto as Exhibit A.

88)     Under the terms of the Section 2(g) of the Agreement, which was signed by Richard Leupen, UGL's Managing Director and CEO on September 14, 2011, UGL promised that, "subject to final Board approval, 39,000 shares of restricted Company shares held by

45

Employee…shall vest as of December 11, 2011 as if his employment had not terminated…" It was represented to Lanzillo that this condition was just a formality, and he was assured of receiving the vesting for the full 39,000 restricted shares ("Shares").  Lanzillo relied on these assurances when he agreed to accept 39,000 shares instead of the 50,000 shares he was entitled to under his contract.

89)     UGL failed and refused to accord Lanzillo full vesting of the shares. Upon information and belief, Richard Leupen recommended to the board that it vest only one half of the shares that Richard Leupen had agreed to recommend.

90)     As of the time of the promised full vesting, the financial value of the 19,500 Shares for which vesting was wrongfully denied was $263,250 (Two Hundred Sixty Three Thousand Two Hundred Fifty Dollars).

91)     Upon information and belief, UGL never sought approval from its Board for the full vesting of Lanzillo's Shares.

92)     Under the terms of Section 2(i) of the Agreement, the Company also agreed that "as and when, (but only if) payments are made by the Company under the terms of its short term incentive plan for the 2011 financial year, the Company will pay to (Lanzillo) 78.1% of the amount to which he would have been entitled under such plan had his employment not terminated…"

93)     Because Lanzillo had met or exceeded all applicable performance metrics, 78.1% of his incentive payment equaled $240,000 for FY2011.

94)     Instead of paying him that amount, the Company paid him only $83,088.  UGL failed and refused to pay Lanzillo the remaining $156,912 which he was owed under the terms of the Agreement.

1738854.1

95)    Lanzillo performed all of his obligations under the Agreement in full.

96)    Upon information and belief, Richard Leupen, UGL's Managing Director and CEO executed the Agreement with no intention of having the company fully perform its obligations under the Agreement.

97)    UGL's failure and refusal to provide full vesting for Lanzillo's Shares and its failure to pay Lanzillo $156,912 of the 2011 bonus payment, constitute material breaches of the Agreement.

98)    Lanzillo has been harmed by UGL's breaches in the amount of, at least, $420,162.

**WHEREFORE,** the counterclaim plaintiffs pray:

1)    that UG2 be awarded, as to Count One, the full amount of its losses resulting from the intentional interference of DTZ and Andrade with UG2's advantageous relations, together with interest, costs and reasonable attorneys' fees;

2)    that UG2 be awarded, as to Count Two, the full amount of its losses resulting from the defamation of UG2 by DTZ and Andrade, together with interest, costs and reasonable attorneys' fees;

3)    that UG2 be awarded, as to Count Three, the full amount of its losses resulting from the injurious falsehood/commercial disparagement of UG2 by DTZ and Andrade, together with interest, costs and reasonable attorneys' fees;

4)    that UG2 be awarded, as to Count Four, the full amount of its losses resulting from DTZ's and Andrade's violation of M.G.L. ch. 93A, together with multiple damages, interest, costs and reasonable attorneys' fees;

5)      that Correia, Peterson, Ryan, Lezama, Desaulniers and Burnell be awarded, as to

Count Five, the full amount of the bonuses to which they were entitled based

upon full funding of DTZ's FY2011 and FY2012 Corporate Leadership Bonus

Incentive Plan;  and that Correia, Ryan, Lezama, and Burnell be awarded, in

Count Five, their wrongfully detained wages, together with interest, costs and

reasonable attorneys' fees;

6)      that Lanzillo be awarded at least $420,162 as to Count Six, together with interest,

costs and reasonable attorneys' fees, against UGL Limited;

7)      that this Court declare that some or all of the restrictive covenants are

unenforceable for reasons of DTZ's breaches of the underlying employment

agreements, unclean hands, and bad faith; and

8)      that this Court award counterclaim plaintiffs such further award as this Court

deems just and proper.

**DEFENDANTS/PLAINTIFFS-IN COUNTERCLAIM DEMAND TRIAL BY JURY
ON ALL COUNTS SO TRIABLE**

1738854.1

UG2 LLC, LOUIS LANZILLO,
JOHN CORREIA, JEFFREY PETERSON,
ROBERT RYAN, ARMANDO LEZAMA,
ROBERT DESAULNIERS,  SCOTT
BURNELL AND JANET GUISTI

By their Attorneys,

*/s/ Daniel S. Tarlow*
Daniel S. Tarlow, BBO #552920
Dtarlow@PrinceLobel.com
William A. Worth, BBO# 544086
Wworth@PrinceLobel.com
Thomas M. Elcock, BBO# 548027
Telcock@PrinceLobel.com
Jeffrey J. Pyle, BBO# 647438
Jpyle@PrinceLobel.com
PRINCE LOBEL TYE LLP
100 Cambridge Street, Suite 2200
Boston, MA  02114
617-456-8000

Dated:  June 20, 2013

## CERTIFICATE OF SERVICE

I, Daniel S. Tarlow, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated as non-registered participants, on June 19, 2013.

*/s/ Daniel S. Tarlow*
Daniel S. Tarlow

49