UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

DTZ, INC.,                          )
UGL LIMITED, and                    )
UGL EUROPE LIMITED,                 )
            Plaintiffs              )
                                    )
v.                                  )      CIVIL ACTION NO. 13-10906-PBS
                                    )
UG2 LLC,                            )
LOUIS LANZILLO,                     )
JOHN CORREIA,                       )
JEFFREY PETERSON,                   )
ROBERT RYAN,                        )
ARMANDO LEZAMA,                     )
ROBERT DESAULNIERS,                 )
SCOTT BURNELL, and                  )
JANET GUISTI,                       )
            Defendants              )
_____)

## SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

### (Leave to file granted on 06/24/2013)

### INTRODUCTION

The plaintiffs DTZ, Inc. ("DTZ"), UGL Limited ("UGL") and UGL Europe Limited ("UGL Europe") bring this action seeking redress against Defendants UG2 LLC, Louis Lanzillo, John Correia, Jeffrey Peterson, Robert Ryan, Armando Lezama, Robert Desaulniers, Scott Burnell, and Janet Guisti (together, "Defendants") because of Defendants' violations of, *inter alia*, the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et. seq.* ("CFAA") and the Lanham Act, including 15 U.S.C. §§ 1114 and 1125. The individual Defendants are former executive officers and key employees of DTZ who are conspiring and working in concert with each other, as well as a newly-formed competing company by the name of UG2 LLC, to misappropriate valuable proprietary and confidential information and trade secrets from DTZ, to access DTZ's

confidential and proprietary information from DTZ's computer network and external electronic storage devices, and otherwise to engage in wrongful competition, all in violation of the Defendants' fiduciary duties and non-compete and non-solicitation agreements, as well as confidentiality agreements and other rights to confidentiality belonging to DTZ. In addition, and in furtherance of Defendants' wrongful competition, their newly formed company UG2 LLC has, *inter alia*, used and continues to use trademarks, logos, and tradenames substantially similar to those owned and/or used by the Plaintiffs. For example, DTZ is authorized to use and enforce, and in fact uses and enforces, the trademark "UGL", thus signifying that it is part of a global network of companies under the "UGL" names and marks. UGL owns and uses the trademark "UGL", and owns the trademarks "UGL Services" and "UGL UNICCO". UGL Europe has filed an application with the United States Patent and Trademark Office ("USPTO") for registration of, and in fact has common law rights to, the trademark "DTZ a UGL company". Defendant UG2 LLC's use of the name and mark "UG2", in combination with a similar logo, is likely to confuse the public, including customers and potential customers of DTZ, as to its affiliation with the UGL family of companies.

DTZ seeks injunctive relief against the Defendants to prohibit them from using DTZ's confidential and proprietary information, to require them to return all documents and things containing or embodying DTZ's confidential and proprietary information, to prohibit them from hiring or trying to hire DTZ's employees, to prohibit them from doing business with or trying to do business with DTZ's customers, and otherwise to prohibit them from breaching the terms of their agreements with and duties to DTZ. DTZ, UGL and UGL Europe seek further injunctive relief against UG2 LLC to prohibit it from using the designation "UG2" and its current logo and similar derivative names, marks or logos in connection with the advertising, sale, or offering for

sale of facilities management or property services. Plaintiffs also seek damages for the harm caused by the Defendants' actions.

## PARTIES

1.        The plaintiff DTZ, Inc. is a Massachusetts corporation with its principal place of business at 275 Grove Street, Suite 3-200, Auburndale, Massachusetts. Previously, the plaintiff did business in Massachusetts as UNICCO Service Company ("UNICCO") and UGL Services Unicco Operations Co. ("UGL Services"), before recently changing its name to DTZ, Inc. The plaintiff also conducts business under the trade name DTZ a UGL company.

2.        The plaintiff UGL is an Australian registered public company with its principal place of business at Level 10, 40 Miller Street, Level 10, North Sydney, NSW, Australia 2060. UGL is the indirect parent of DTZ. DTZ has license rights to the trademarks and logos which are the subject of this Complaint.

3.        The plaintiff UGL Europe is organized under the laws of England and Wales with limited liability with a principal place of business at 125 Old Broad Street, London, United Kingdom EC2N 1AR. UGL is the direct parent of UGL Europe.

4.        The defendant UG2 LLC is a Massachusetts limited liability company with a principal place of business, according to the Massachusetts Secretary of State records, of 110 Walker Street, Weston, Massachusetts.

5.        The defendant Louis Lanzillo is a resident of Weston, Massachusetts, and is the Chief Executive Officer, founder, owner, and manager of UG2 LLC.

6.        The defendant John Correia is an individual who, upon information and belief, resides in Arlington, Massachusetts.

7.     The defendant Jeffrey Peterson is an individual who, upon information and belief, resides in Wellesley, Massachusetts.

8.     The defendant Robert Ryan is an individual who, upon information and belief, resides in Roslindale, Massachusetts.

9.     The defendant Robert Desaulniers is an individual who, upon information and belief, resides in Boston, Massachusetts.

10.    The defendant Armando Lezama is an individual who, upon information and belief, resides in Salem, Massachusetts.

11.    The defendant Scott Burnell is an individual who, upon information and belief, resides in Lunenburg, Massachusetts.

12.    The defendant Janet Guisti is an individual who, upon information and belief, resides in North Quincy, Massachusetts.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the Defendants' acts constitute violations of federal law, including the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*, and the Lanham Act, 15 U.S.C. §1051, *et seq.* Supplemental jurisdiction is invoked pursuant to 28 U.S.C. § 1367.

14.    Venue is proper in this Court pursuant to 29 U.S.C. § 1391(b) because the acts complained of occurred in this judicial district and division. UG2's and DTZ's principal places of business are located in Massachusetts, and the DTZ computers and information to which Defendants gained unauthorized access are located in Massachusetts. John Correia, Jeffrey Peterson, Robert Ryan, Armando Lezama, Robert Desaulniers, Scott Burnell, and Janet Guisti are former DTZ employees and undertook all or much of the complained-of conduct in

Massachusetts. The remainder of the Defendants, on information and belief, reside in this division, and they undertook all or much of the complained-of conduct in Massachusetts.

## FACTUAL ALLEGATIONS

**DTZ's Business, Confidential Information, and Customer Relationships**

15.     UNICCO was founded and has been operating in Massachusetts since 1949. In 2007, UNICCO was acquired by UGL Limited (formerly known as United Group Limited) ("UGL"), a company headquartered in Australia, with numerous subsidiaries and operating locations across the globe. UNICCO continued operating in Massachusetts as a Massachusetts corporation under the name UNICCO Service Company and later as UGL Services Unicco Operations. Most recently, since late 2012, the company has been operating in Massachusetts using the mark "DTZ a UGL company", and in 2013 changed its legal name to "DTZ, Inc." Customers of DTZ associate it with the former UNICCO and UGL Services, and DTZ encourages its customers to recognize that it is now part of the UGL global family.

16.     DTZ is a global leader in providing a broad range of services to commercial property owners. Among other things, DTZ provides real estate brokerage services and consultancy services with respect to day-to-day property management, facilities operations, and maintenance services. Throughout the United States, DTZ specializes in, and is recognized as an industry leader in, facilities management and building maintenance services. DTZ has approximately 17,000 employees servicing 800 clients at more than 10,000 work sites across the United States.

17.     Over many years, UNICCO, UGL, UGL Services, and now DTZ have invested enormous time and resources developing a thriving facilities management operation throughout the Northeast. The Company has recruited and developed a highly trained and experienced team of executives, managers, and key employees with many responsibilities,

including generating new client contracts, servicing and maintaining existing client contracts, improving the quality of the Company's services, and generally expanding the business.

18.     DTZ has a team of managers with the title "Director of Operations" who are responsible for generating new client business, maintaining existing client relationships, and supervising other DTZ managers and employees who are responsible for delivering excellent client service.

19.     Further, DTZ has a team of managers with the title "Operations Manager" who are responsible for the day-to-day management of customer relationships. The Operations Managers report to the Directors of Operations and are responsible for supervising teams of employees who provide services daily on-site at the clients' locations.

20.     The market for facilities management and maintenance services is intensely competitive. DTZ relies on its customer and prospective customer relationships and its knowledge of the customers' and prospective customers' business needs to maintain its competitive advantage. Over the years, a key to DTZ's success – in addition to striving to provide the highest quality front-line customer service – is the constant development and maintenance of its good will and excellent customer relationships. DTZ places great trust and responsibility in its executives, managers, and key employees, including its Directors of Operations and Operations Managers, to help the company achieve these goals.

21.     Over time, the senior executives, managers, and other key employees come to possess enormous quantities of highly valuable proprietary and confidential information which are integral to the successful operation of DTZ's business. For example, the executives and managers possess knowledge and information regarding customer contacts, the history of services DTZ has provided to particular customers, the specific terms of customer contractual

agreements, detailed pricing information, profit margins, and specific information regarding how contracts have been negotiated and revised over the years. The executives and managers also possess confidential information regarding policy manuals, procedural guidelines, training manuals and materials, software, applications, and other intellectual property developed by or purchased for DTZ, and other information needed to meet customer demands and maintain business from year to year.

22.     DTZ spends time and resources tracking and analyzing its own customer services and business data, as well as that of its competitors' products and services. DTZ develops strategies to emphasize its strengths against competitors' weaknesses and to respond to customers' needs and competitors' efforts to recruit away DTZ business. Consequently, DTZ's executives, managers, and key employees possess vast confidential information regarding its business retention plans, marketing strategies, and new business development strategies, as well as a broad range of information regarding short term and long term business planning.

23.     DTZ has many policies, procedures, and measures in place to protect this and other proprietary and confidential information concerning customers and business strategy. Likewise, DTZ takes steps to protect the confidentiality of human resources information including employee recruiting, retention, promotion, compensation, performance reviews and evaluations, and other policies and procedures.

24.     For example, each year DTZ distributes to all employees an "Employee Handbook," which sets forth the policies and requirements employees are required to follow. Among other things, the Employee Handbook, at page 22 under the category "Major Offenses," prohibits employees from disclosing or discussing confidential company information, business, and practices with anyone outside the company, including clients and clients' employees.

25.     In addition, in 2011, the Company distributed to all employees a "Policy of Business Conduct," which, among other things, set forth the following safeguards and prohibitions with respect to the Company's "Confidential Information":

> Information relating to confidential or proprietary information and trade secrets (including, but not limited to, secret processes, marketing plans, strategic plans, account staffing and pricing, engineering, new products, research work or developments and other secret aspects of the Company's businesses) as well as lists of customers and suppliers are corporate assets which belong to the Company. No Company employee should disclose, communicate, or use any of the Company's trade secrets and confidential or proprietary information in any way not authorized by the Company, through its management, in furtherance of the Company's business interests. All employees should use all reasonable means to safeguard such trade secrets and confidential and proprietary information. Management employees must set a high standard of corporate security, using "need to know" as a guiding principle for determining which employees have access to specific information. All employees are cautioned that, at common law, these restrictions continue after the voluntary or involuntary termination of employment, even in the absence of a written contract.

26.     DTZ also configures and maintains its information technology and computer systems with numerous controls and safeguards to protect its confidential information and mitigate risk. For example, access to electronic data is provided on a "need to know" basis only after manager approval. Each user of the computer system is assigned a unique user name, and each user must create a unique password (containing a minimum of eight characters, including at least one alphabetic character and one numeric character; the password cannot contain more than two repeating characters or the user name; and the user cannot repeat the last six passwords). When a user attempts to access the system, the user account will become locked after three failed access attempts. DTZ also utilizes a centrally managed anti-virus/malware protection suite on all laptops, desktops, and servers; a centrally managed patch management system on all laptops, desktops, and servers; and an identity and access management solution for account provisioning/de-provisioning, user validation, and access recertification.

27.     The Employee Handbook, at page 24, states: "Electronic mail and computers are provided for business purposes only.  Use inconsistent with UGL Services' legitimate business interest is grounds for discipline up to and including discharge."

28.     Further, the Policy of Business Conduct, at pages 16-17, states: "No employee shall misuse company property.  Examples of misuse include, but are not limited to: … Personal use of Company telephones, cell phones, pagers, computers, email, Internet access, where such personal use is inconsistent with the individual employee's duties and instructions or where such personal use is otherwise inconsistent with the Company's business interests …."

29.     In addition, each time a user attempts to access the computer system, he or she first sees the following message before gaining access to DTZ's computer system and its electronically stored information:

> ** IMPORTANT NOTICE: BY PROCEEDING, YOU AGREE TO THE FOLLOWING **
>
> This is a DTZ computer system. Access to this device is restricted to those individuals with specific permissions for business purposes. Unauthorized or improper use of this system may result in administrative disciplinary action and civil and criminal penalties. Any or all uses of this system and all files on this system may be intercepted, monitored, recorded, copied, audited, inspected, and disclosed to authorized company personnel, and law enforcement personnel. By continuing to use this system you indicate your awareness of and consent to these terms and conditions of use.

The user must click on an "OK" button, acknowledging the policy, before proceeding to gain access to the computer system.

30.     Given the valuable and sensitive nature of its proprietary and confidential business information, the Company has required certain key employees – including all Account Managers, Area Managers, Operations Managers, Directors of Operations, and Vice Presidents of Operations – to sign a "Contract for the Protection of UGL Services Unicco Operations Co.'s Business Interests" ("Contract for the Protection of Business Interests").  In order to protect

DTZ's confidential information, customer good will, and business relationships, the Contract for the Protection of Business Interests requires, among other things, that the employee: "Promise not to (1) reveal or use UGL Services' confidential and proprietary information, (2) take or try to take UGL Services' customers or good will, or (3) hire or try to hire UGL Services' key employees."

31.     With regard to the protection of confidential information, the Contract for the Protection of Business Interests further states:

> During and after your employment with UGL Services, you Promise not to disclose or use UGL Services' confidential and proprietary information except on behalf of UGL Services. "Disclose" means to disclose, reveal or give to any person, business, organization or entity other than UGL Services, except in response to a court order or other valid legal process. "Use" means to use for your own benefit or the benefit of any person, business, organization or entity other than UGL Services. "Confidential information" includes, but is not is limited to, UGL Services' financial, technical, staffing, scheduling, customer, sales, marketing or employee information. "Proprietary information" includes, but is not limited to, UGL Services' policy manuals, procedural guidelines, training manuals and materials, software and applications, and any other intellectual property developed by or purchased for UGL Services. "Confidential and proprietary information" also includes information and material that you develop for UGL Services during your employment, whether or not you developed it during your normal assignment and hours.

These restrictions on use and disclosure of DTZ's information continue after the termination of employment with DTZ.

32.     Further, to protect DTZ's customer service and good will, the Contract for the Protection of Business Interests provides:

> During your employment at UGL Services, and for a period of two years after you leave UGL Services' employment for any reason, you promise not to take or try to take UGL Services' customers for services UGL Services provides. "Take or try to take" means contacting UGL Services' customers to offer or suggest they purchase services from any other business or organization, or agreeing to provide UGL Services' customers such services after they contact you. "UGL Services'

customers" means any business or organization that purchases services or accepts proposals from UGL Services during or after your employment. "Services UGL Services provides" means any of the services UGL Services provides to any of its customers during or after your employment.

33.    In addition, the Contract for the Protection of Business Interests contains a provision prohibiting the recruitment of DTZ employees:

> During your employment at UGL Services, and for a period of two (2) years[1] after you leave UGL Services' employment for any reason, you Promise not to hire or try to hire UGL Services' key employees. "Hire or try to hire" means contacting UGL Services' employees to offer or suggest employment with any other business or organization, or hiring them for another business or organization after they contact you. "Key employees" mean those salaried UGL Services employees making more than $25,000[2] per year, whether hired by UGL Services before, during, or after your employment.

## The Defendants' Misappropriations, Breaches, and Unfair Competition

### Louis Lanzillo and UG2

34.    The defendant Louis Lanzillo was a long-time employee of UNICCO and UGL with a career spanning two decades in several executive roles. Over the years, Lanzillo's many responsibilities increased, and he rose through the ranks to become a trusted and valued senior executive. From 1986 to 1996, Lanzillo served as UNICCO's Vice President of Finance and Administration and as President of its New England and Facility Service divisions. In 2003, Lanzillo served as an independent consultant to UNICCO working on special company projects. From 2004 to 2007, Lanzillo was UNICCO's Vice Chairman and Executive President. In 2007, UNICCO became a subsidiary of UGL, and Lanzillo became the Chief Operating Officer for the United States and Europe. In that regard, Lanzillo was the first of the former UNICCO

---

[1] In certain instances, this provision in the Contract for the Protection of Business Interests was limited to one year for specific employees, as is indicated where appropriate below.

[2] In certain instances, as is indicated where appropriate below, this provision in the Contract for the Protection of Business Interests defined "Key employees" as those "making more than $20,000 per year" or those "making more than $75,000 per year in base salary and/or commissions."

employees to be promoted to one of the most senior positions in UGL's subsidiary United Group USA, Inc. Lanzillo was provided substantial compensation and many generous benefits. In addition, during his employment and for valuable consideration, Lanzillo executed several restrictive covenants, including a Confidentiality, Noncompetition and Nonsolicitation Agreement.

35.     By signing the Confidentiality, Noncompetition and Nonsolicitation Agreement, dated July 3, 2007, Lanzillo agreed that:

> (i) the Business (as defined below) in which the Company is engaged is intensely competitive and that your employment by the Company requires that you have access to, and knowledge of, confidential information of the Company, not generally published or available to the public, including, but not limited to, business plans, operational methods, financial information and projections, technical processes and data, research and development, customer and client lists, interests and needs of customers and clients, business plans and policies, overhead and cost information, profit margins, pricing methods or prices considered or actually charged, lists and records of sales and contracts, computer software applications and other programs, source codes, object codes, processes, formulas, designs, marketing techniques and materials, marketing and development plans, price lists, pricing policies, confidential know-how, personnel information and other trade secrets of the Company, all of which are of vital importance to the success of the Company's Business (collectively, "Confidential Information"); (ii) the disclosure of any of the foregoing to existing or potential competitors of the Company could place the Company at a serious competitive disadvantage and could do serious damage, financial and otherwise, to the business of the Company; (iii) by your training, experience and expertise, your services to the Company are extraordinary, special and unique; and (iv) the Company at all times retains ownership and control of all the Confidential Information.

36.     The Confidentiality, Noncompetition and Nonsolicitation Agreement further prohibited Lanzillo, during his employment and at all times thereafter, from using, disclosing, or otherwise communicating the Company's confidential information.

37.     The Confidentiality, Noncompetition and Nonsolicitation Agreement further imposed a one-year, one-hundred-mile noncompetition prohibition as well as a nonsolicitation

prohibition with respect to the solicitation, recruitment, or inducement of both customers or employees of the Company.

38. By 2011, Lanzillo was the most senior executive with responsibility for overseeing a substantial portion of UNICCO's operations across the United States. In April 2011, UGL terminated Lanzillo's employment. In a Separation and Release Agreement dated August 17, 2011, Lanzillo re-affirmed and acknowledged his agreement and obligation to comply with all of the terms of the Confidentiality, Noncompetition and Nonsolicitation Agreement, dated July 3, 2007. In other words, Lanzillo again agreed to comply with the provisions prohibiting the use or disclosure of the Company's confidential information for a period that continued "for all times" after the termination of the employment relationship. Lanzillo also agreed to comply with the noncompetition and nonsolicitation provisions for a period of one year.

39. In December 2012, Lanzillo established a business entity called UG2 LLC, which is registered with the Massachusetts Secretary of State's Office. According to its Certificate of Organization, UG2 is in business "to provide facilities maintenance services." Lanzillo created and is operating UG2 to compete directly against and cause harm to DTZ. Lanzillo is the Chief Executive Officer of UG2 LLC.

40. As demonstrated by the facts alleged below, Lanzillo's plans and intentions are to lure away DTZ's senior executives, managers, and key employees, improperly obtain and use DTZ's proprietary and confidential information, and unfairly and improperly compete against DTZ to lure away DTZ's valuable customer accounts. Upon information and belief, Lanzillo, acting in concert with the other Defendants, intends to cause significant financial and

reputational harm to DTZ and to unjustly and improperly benefit and enrich UG2, Lanzillo, and the other Defendants.

41.     Beginning in late 2012 and continuing at least through the date of the filing of the Complaint in April 2013, Lanzillo has been actively soliciting and recruiting DTZ's most important key employees who are responsible for DTZ's key customer accounts and the significant customer good will that is represented in DTZ's northeast regional operations. Lanzillo, acting in concert with others, is encouraging and inducing DTZ employees to violate the terms of their agreements with DTZ, including prohibitions against the use or disclosure of DTZ's confidential information, prohibitions against the solicitation of DTZ's customers, and prohibitions against the solicitation of DTZ's employees.  Lanzillo's actions are in violation of his agreements with and duties to the Company, as he is relying on DTZ's confidential and proprietary information to specifically target the most valued employees, who themselves possess critical confidential information and valuable customer relationships, and who are in the best position to further the goal of targeting DTZ's key customer accounts.  Lanzillo is also disseminating false and defamatory information regarding DTZ to lure key employees to UG2 and to cause other harm to DTZ's reputation and business.  As a result of this deliberate and malicious conduct, DTZ's entire New England Operations team is "under siege" by UG2, Lanzillo, and the other Defendants, and a significant portion of DTZ's business is at risk.

**John Correia**

42.     The defendant John Correia was a key DTZ employee who was employed by the Company for more than 30 years.  Over those years Correia rose from a rank-and-file maintenance worker to a senior executive.  From 2011 to early 2013, Correia was the Senior Vice President of Operations for the East Region, one of the most senior ranking members of

DTZ's operations in North America.  Over the years of his employment, Correia played a central role in building and expanding DTZ's customer relationships, good will, and contractual agreements.  As a result of his position and years with the company, Correia possesses a substantial amount of protected, confidential and proprietary information which belongs to DTZ. He also has, is aware of, and benefited from DTZ's strong relationships with its customers.

43. On or about October 20, 2011, Correia executed a "Contract for the Protection of UGL Services Unicco Operations Co.'s Business Interests."  Among other things, the Contract for the Protection of Business Interests prohibits Correia from: (1) for an indefinite time, disclosing or using the Company's confidential and proprietary information; (2) for a period up to two years after employment, taking or trying to take the Company's customers; and (3) for a period up to two years after employment, hiring or trying to hire the Company's employees.

44. Correia executed a similar Contract for the Protection of Business Interests dated May 23, 2011.

45. Correia also executed a "Confidentiality, Noncompetition, and Nonsolicitation Agreement" dated June 29, 2007.  That agreement prohibits the use or disclosure of the Company's confidential information for a period continuing "at all times" after the termination of employment.  That agreement also contains the following noncompetition and nonsolicitation provisions which continue for a period of one year after the termination of employment:

- During your employment with the Company and for one (1) year after the termination of your employment by either you or the Company (the "Non-Compete Period"), you will not, without the prior written consent of the Company, anywhere within a 100 mile radius of your primary UNICCO office, compete, directly or indirectly, with the Business of the Company, (whether as officer, director, stockholder, member, manager, partner, associate, employee, agent, consultant, owner or otherwise) or have an interest in, or be associated with, any corporation, firm or enterprise engaging, in the Business…. For purposes of this Agreement only, "Business" shall mean the provision of maintenance, cleaning, cleaning

consulting, facility management and/or watchman services and all other businesses during the last twelve (12) months of your employment in which the Company engaged or had plans to engage.

- During the Non-Compete Period, you shall not, either directly or indirectly, (i) solicit, induce, recruit, or encourage any employee, agent or contractor of the Company to accept employment or provide services to any person or entity other than the Company; (ii) hire or attempt to hire any employee, agent or contractor of the Company; (iii) cause or attempt to cause any employee, agent or contractor of the Company to terminate his or her employment or contractor relationship with the Company, or otherwise engage or participate in any effort or act to induce any such person to discontinue a relationship with the Company.

- During the Non-Compete Period, you shall not, either directly or indirectly, (i) solicit any Business from, or conduct any Business with, any person or entity who was a customer or client of the Company at any time during the last twelve (12) months of your employment with the Company, (ii) solicit any Business from or conduct any Business with any person or entity that was known by you to be solicited or identified as a Business prospect by the Company during the last twelve (12) months of your employment with the Company, (iii) interfere or attempt to interfere with any transaction, agreement, prospective agreement, business opportunity or business relationship in which the Company is involved, with respect to the Business, or (iv) otherwise engage or participate in any effort or act to induce any person or entity to discontinue a Business relationship with the Company.

46.     On January 31, 2013, Correia announced his resignation, and his last day of work with DTZ was March 1, 2013.  Lanzillo and Correia communicated regularly during the months leading up to Correia's resignation and departure from DTZ, upon information and belief, regarding the strategy for growing UG2 by unlawfully using DTZ's confidential information and breaching restrictive covenants, duties, and other obligations owed to DTZ. While still employed by DTZ but planning to join UG2, Correia acquired interests that were adverse to DTZ and breached his duties owed to DTZ.  In other words, while still employed and being paid by DTZ, Correia became a "double agent" and began acting for the benefit of UG2, himself, and other Defendants.  During the days, weeks and/or months leading up to his resignation and departure from DTZ, Correia, without authorization and/or in excess of his

authorization, accessed DTZ's confidential and proprietary information from DTZ's computer network and external electronic storage devices. Correia began working for UG2 immediately following his departure from DTZ. Correia is Senior Vice President of Operations for UG2. Upon information and belief, Correia has an equity ownership interest in UG2, and he will be compensated and rewarded based upon his ability to help UG2 (a brand new business) grow and expand its customer base.

47.     Correia is actively working together with UG2 and Lanzillo in violation of their duties to and agreements with DTZ. Upon information and belief, Correia is using DTZ's confidential information to develop and further UG2's business plans, including which key DTZ employees to recruit to UG2 and how best to accomplish the recruitment goals. Similarly, upon information and belief, Correia is using DTZ's confidential customer information and customer relationships to develop and further UG2's business plans regarding the targeting and solicitation of DTZ customers. In fact, among other things, Correia and Ryan have been actively helping UG2 setup and run new accounts with customers who were wrongfully taken away from DTZ by UG2 and the other Defendants. Not only are Correia and Lanzillo violating their agreements with and duties to DTZ, but they are also actively encouraging and inducing other DTZ employees and former employees to do the same.

**Jeffrey Peterson**

48.     The defendant Jeffrey Peterson was an employee of UNICCO, UGL, and DTZ for 14 years. In July 2011, Peterson was promoted and appointed the Chief Information Officer ("CIO") for the company worldwide. As the CIO, Peterson had responsibility for, knowledge of, and access to all of DTZ's critical, highly valued confidential and proprietary information including information regarding DTZ's finances, business operations, marketing strategies,

customers, sales, and customer relationships. Among his many responsibilities, Peterson was responsible for leading efforts to manage the company's vast customer and business information and to develop systems to improve the company's use of and ability to profit from such information. For example, Peterson recently spearheaded a year and half long project to update DTZ's technology systems to ensure DTZ used optimal technology to maintain its client information, its billing and employee detail, and virtually all essential data required for the company to conduct its operations on a day-to-day basis. Peterson was also responsible for ensuring the protection of the company's valuable proprietary and confidential information.

49.    On or about July 19, 2011, while an employee of the Company, Peterson executed a "Contract for the Protection of UGL Limited's Business Interests." Among other things, the Contract for the Protection of Business Interests prohibits Peterson from: (1) for an indefinite period, disclosing or using DTZ's confidential and proprietary information; (2) for a period up to two years after employment, taking or trying to take DTZ's customers; and (3) for a period up to of one year after employment, hiring or trying to hire DTZ's employees. In this agreement, "Key employees" is defined as those "making more than $75,000 per year in base salary and/or commissions."

50.    Peterson executed a similar "Contract for the Protection of Business Interests" dated June 24, 2002. This agreement prohibited the hiring of key employees for a two year period after employment, and "Key employees" was defined as those "making more than $25,000 per year."

51.    Peterson also executed a "Confidentiality, Noncompetition, and Nonsolicitation Agreement" dated June 29, 2007, which contained the same provisions stated in paragraph 41 above, prohibiting the use or disclosure of confidential information, and imposing a

one-year, one-hundred-mile noncompetition prohibition as well as a nonsolicitation prohibition with respect to the solicitation, recruitment, or inducement of both customers or employees of the Company.   Among other things, the Agreement prohibits competition with respect to "the provision of maintenance, cleaning, cleaning consulting, facility management and/or watchman services."   Peterson, Correia, UG2, and the other defendants, are operating within 100 miles of DTZ's office and offering to provide exactly those same services to its potential customers, including DTZ's current customers, in violation of the terms of the Confidentiality, Noncompetition, and Nonsolicitation Agreement.

52.      On January 7, 2013, Peterson announced his resignation, and his last day of work with DTZ was March 1, 2013.   Peterson advised DTZ that he was leaving for personal family reasons, including a desire to devote more time to caring for his sick wife, spend more time with his daughters, slow down his professional pace, and spend less time traveling globally for business.

53.      Lanzillo and Peterson communicated regularly during the months leading up to Peterson's resignation and departure from DTZ, upon information and belief, regarding the strategy for growing UG2 by unlawfully using DTZ's confidential information and breaching restrictive covenants, duties, and other obligations owed to DTZ.   While still employed by DTZ but planning to join UG2, Peterson acquired interests that were adverse to DTZ and breached his duties owed to DTZ.   In other words, while still employed and being paid by DTZ, Peterson became a "double agent" and began acting for the benefit of UG2, himself, and other Defendants.   During the days, weeks and/or months leading up to his resignation and departure from DTZ, Peterson, without authorization and/or in excess of his authorization, accessed DTZ's confidential and proprietary information from DTZ's computer network and external electronic

storage devices. Immediately upon his departure from DTZ, Peterson began working at UG2 as the Senior Vice President for Strategy and Innovation. After his departure from DTZ, Peterson continued to access the DTZ computer system, including accessing DTZ's computer Portal and his previous DTZ email account to send DTZ information to Lanzillo, Correia, and Guisti (while she was still working at DTZ but was using a UG2 email account) for UG2's benefit. Upon information and belief, Peterson has an equity ownership interest in UG2, and he will be compensated and rewarded based upon his ability to help UG2 (a brand new business) grow and expand its customer base.

54. Peterson is actively working together with UG2, Lanzillo, and Correia in violation of their duties to and agreements with DTZ. For example, upon information and belief, Peterson is using DTZ's confidential information to develop and further UG2's business plans, including which key DTZ employees to recruit to UG2 and how best to accomplish the recruitment goals. Similarly, upon information and belief, Peterson is using DTZ's confidential customer information and customer good will to develop and further UG2's business plans regarding the targeting and solicitation of DTZ customers. Not only are Peterson, Correia, and Lanzillo violating their agreements with and duties to DTZ, but they are also actively encouraging and inducing other DTZ employees and former employees to do the same.

55. Upon information and belief, since late 2012 through 2013, Lanzillo, Correia, and Peterson have been working in concert to develop a plan and to take actions with the intention of benefiting UG2 and harming DTZ. Upon information in belief, Lanzillo, Correia, and Peterson plan to and have taken actions to recruit and hire away DTZ's key executives, managers, and other key employees; to disclose and use DTZ's proprietary and confidential information; and to solicit and do business with DTZ's valuable customers. The Defendants'

unfair and malicious actions are in violation of numerous contractual agreements and common law and statutory duties and are causing substantial harm to DTZ.

## Recruitment and Hiring of Key DTZ Employees

56.     Since Correia and Peterson have resigned from DTZ and begun working with Lanzillo to develop and grow UG2's business, the Defendants have been acting in concert in clear violation of their duties to and agreements with DTZ.  As described below, they have been actively, unfairly, and improperly inducing key DTZ employees to violate their duties to and agreements with DTZ.  The Defendants UG2, Lanzillo, Correia, and Peterson deliberately targeted these key employees because they possess DTZ's valuable confidential information, as well as relationships with DTZ's customers, which the defendants intend to use to benefit UG2 and themselves.  UG2, Lanzillo, Correia, and Peterson's efforts and actions in this regard were deliberately calculated and targeted at specific key employees who are in the best position to help UG2 and the defendants to unfairly compete against DTZ and usurp DTZ's customer relationships.  This deliberate and calculated plan is intended and designed not just to benefit the Defendants but also to inflict the greatest maximum harm on DTZ.

### Robert Ryan

57.     For example, the defendant Robert Ryan was employed by UNICCO and DTZ for more than 19 years.  Most recently, Ryan was a Director of Operations in the Northeast Region with significant responsibilities for maintaining, developing, and growing numerous DTZ customer accounts and contractual relationships.  Ryan had responsibilities for a portfolio of educational institutions representing highly valued customer relationships and substantial annual revenue for DTZ.  Ryan worked under and reported to Correia.

58.     Throughout his employment with UNICCO and DTZ, Ryan has been subject to the restrictions, terms, and conditions – as described above – prohibiting his disclosure or use of confidential information, taking or trying to take customers, and hiring or trying to hire employees.

59.     For example, in 2001, as a condition of participating in the Fiscal Year 2002 Unicco Leadership Bonus Incentive Plan, Ryan was required to agree to the terms of the company's "Contract for the Protection of Unicco Business Interests." That contract provided that Ryan was prohibited from: (1) for an indefinite period, disclosing or using the company's confidential and proprietary information; (2) for a period up to two years after employment, taking or trying to take the company's customers; and (3) for a period up to one year after employment, from hiring or trying to hire the company's employees.

60.     In addition, Ryan executed an agreement dated August 28, 1995 with similar restrictive covenants. Among other things, Ryan acknowledged and agreed to the following terms and conditions:

- "[T]he parties hereby agree and acknowledge that the Accounts and Customer Lists of UNICCO are a valuable, special, and unique asset of Unicco, which result from a sizeable investment of UNICCO;"

- "[Ryan] will keep secret and not divulge, disclose, otherwise furnish … the names and addresses of and/or other information concerning each and every customer or client of UNICCO in whole or in part; nor shall [Ryan] make use of any or all of the aforesaid names, addresses, and other customer and account information for [Ryan's] own purpose or for the benefit of any person, firm, corporation or other entity (except UNICCO) under any circumstances."

- For a period of two years after employment, Ryan "shall not directly or indirectly solicit business of the type carried on by UNICCO, from customers or clients of UNICCO; and shall not otherwise make use of any or all of the names and addresses of and/or other information concerning each and every customer or client of UNICCO for [Ryan's] own benefit or for the benefit of any person, firm, corporation, or other entity (except UNICCO) under any circumstances."

61.     On March 15, 2013, Ryan announced his resignation from DTZ. Ryan communicated several times with both Lanzillo and Correia during the period shortly before his resignation and departure from DTZ, upon information and belief, regarding the strategy for growing UG2 by unlawfully using DTZ's confidential information and breaching restrictive covenants, duties, and other obligations owed to DTZ. While still employed by DTZ but planning to join UG2, Ryan acquired interests that were adverse to DTZ and breached his duties owed to DTZ. In other words, while still employed and being paid by DTZ, Ryan became a "double agent" and began acting for the benefit of UG2, himself, and other Defendants. During the days, weeks and/or months leading up to his resignation and departure from DTZ, Ryan, without authorization and/or in excess of his authorization, accessed DTZ's confidential and proprietary information from DTZ's computer network and external electronic storage devices. Ryan has begun working for UG2 as Director of Operations. Upon information and belief, Ryan has significant responsibility for helping UG2 develop new client contractual relationships and expand its business in the Northeast. In fact, among other things, Correia and Ryan have been actively helping UG2 setup and run new accounts with customers who were wrongfully taken away from DTZ by UG2 and the other Defendants. Upon information and belief, Ryan will be substantially compensated and rewarded for helping grow UG2's business. Upon information

and belief, UG2, Lanzillo, Correia, and Peterson targeted and recruited Ryan because of his significant knowledge of DTZ's confidential information, important customer relationships, and DTZ's good will with its customers.

**Armando Lezama**

62.        Armando Lezama also was employed for many years by UNICCO and DTZ. In 2005, Lezama was promoted to Operations Manager in the New England Region with significant responsibilities for providing valuable services to several important customers. As a result of his time with the company and his customer service responsibilities, Lezama possesses extensive valuable proprietary and confidential information of DTZ, as well as relationships with DTZ's customers. Lezama worked under and reported to Correia and Ryan.

63.        Similar to the agreements described above, Lezama also executed agreements prohibiting him from disclosing or using confidential information, taking or trying to take customers, or hiring or trying to hire employees. Lezama executed a "Contract for the Protection of Unicco Business Interests" dated August 1, 2000. In this agreement, "Key employees" is defined as those "making more than $20,000 per year." Lezama executed a "Non-competition Agreement" dated October 26, 1998, and a "Non-competition Agreement" dated October 21, 1997.

64.        On March 11, 2013, Lezama announced his resignation from DTZ. Lezama communicated several times with Lanzillo during the period shortly before his resignation and departure from DTZ, upon information and belief, regarding the strategy for growing UG2 by unlawfully using DTZ's confidential information and breaching restrictive covenants, duties, and other obligations owed to DTZ. While still employed by DTZ but planning to join UG2, Lezama acquired interests that were adverse to DTZ and breached his duties owed to DTZ. In other

words, while still employed and being paid by DTZ, Lezama became a "double agent" and began acting for the benefit of UG2, himself, and other Defendants. During the days, weeks and/or months leading up to his resignation and departure from DTZ, Lezama, without authorization and/or in excess of his authorization, accessed DTZ's confidential and proprietary information from DTZ's computer network and external electronic storage devices. Lezama has begun working for UG2 as an Operations Manager. Upon information and belief, he will have responsibilities for helping UG2 develop and grow its new business, and he will be significantly compensated and rewarded for helping UG2 grow and develop its customer base. Upon information and belief, UG2, Lanzillo, Correia, Peterson, and Ryan targeted and recruited Lezama because of his significant knowledge of DTZ's confidential information, important customer relationships, and DTZ's good will with its customers.

**Robert Desaulniers**

65.      Robert Desaulniers was also employed for many years by UNICCO and DTZ. In 2010, Desaulniers became an Operations Managers in the New England Region with significant responsibilities for providing valuable services to several important customers. As a result of his time with the company and his customer service responsibilities, Desaulniers possesses extensive valuable proprietary and confidential information of DTZ, as well as relationships with DTZ's customers. Desaulniers worked under and reported to Correia and Ryan.

66.      Similar to the agreements described above, Desaulniers also executed the "Contract for the Protection of Unicco Business Interests," dated November 29, 2010, prohibiting him from disclosing or using confidential information, taking or trying to take

customers, or hiring or trying to hire employees. In this agreement, "Key employees" is defined as those "making more than $20,000 per year."

67.     On March 20, 2013, Desaulniers announced his resignation from DTZ. Desaulniers has begun working for UG2. Desaulniers communicated several times with both Lanzillo and Ryan during the period shortly before his resignation and departure from DTZ, upon information and belief, regarding the strategy for growing UG2 by unlawfully using DTZ's confidential information and breaching restrictive covenants, duties, and other obligations owed to DTZ. While still employed by DTZ but planning to join UG2, Desaulniers acquired interests that were adverse to DTZ and breached his duties owed to DTZ. In other words, while still employed and being paid by DTZ, Desaulniers became a "double agent" and began acting for the benefit of UG2, himself, and other Defendants. During the days, weeks and/or months leading up to his resignation and departure from DTZ, Desaulniers, without authorization and/or in excess of his authorization, accessed DTZ's confidential and proprietary information from DTZ's computer network and external electronic storage devices. Desaulniers immediately began working for UG2 as Business Development and Operations Manager and he will have responsibilities for helping UG2 develop and grow its new business, and he will be significantly compensated and rewarded for helping UG2 grow and develop its customer base. Upon information and belief, UG2, Lanzillo, Correia, Peterson, and Ryan targeted and recruited Desaulniers because of his significant knowledge of DTZ's confidential information, important customer relationships, and DTZ's good will with its customers.

**Scott Burnell**

68.     Scott Burnell was also employed for many years by UNICCO and DTZ. In 2011, Burnell became the Senior Director of Technical Services. Burnell worked under and

reported to Peterson. As a result of his time with the company and his responsibilities, Burnell possesses extensive valuable proprietary and confidential information of DTZ.

69.     Similar to the agreements described above, Burnell also executed the "Contract for the Protection of UGL Services Unicco Operations Co.'s Business Interests," dated May 23, 2011, prohibiting him from disclosing or using confidential information, taking or trying to take customers, or hiring or trying to hire employees.

70.     On March 24, 2013, Burnell announced his resignation from DTZ, and he has begun working for UG2 as Senior Director of Technical Services. Burnell communicated several times with both Lanzillo and Desaulniers during the period shortly before his resignation and departure from DTZ, upon information and belief, regarding the strategy for growing UG2 by unlawfully using DTZ's confidential information and breaching restrictive covenants, duties, and other obligations owed to DTZ. While still employed by DTZ but planning to join UG2, Burnell acquired interests that were adverse to DTZ and breached his duties owed to DTZ. In other words, while still employed and being paid by DTZ, Burnell became a "double agent" and began acting for the benefit of UG2, himself, and other Defendants. During the days, weeks and/or months leading up to his resignation and departure from DTZ, Burnell, without authorization and/or in excess of his authorization, accessed DTZ's confidential and proprietary information from DTZ's computer network and external electronic storage devices. Upon information and belief, he will have responsibilities for helping UG2 develop and grow its new business, and he will be significantly compensated and rewarded for helping UG2 grow and develop its customer base. Upon information and belief, UG2, Lanzillo, Correia, Peterson, and Ryan targeted and recruited Burnell because of his significant knowledge of DTZ's confidential information, important customer relationships, and DTZ's good will with its customers.

**Janet Guisti**

71.     Janet Guisti was a DTZ employee for more than 13 years. She served as an administrative assistant to the defendant Jeffrey Peterson during her tenure. As a result of her time with the company and her responsibilities, she possesses extensive valuable proprietary and confidential information of DTZ.

72.     Similar to the agreements described above, Guisti also executed the "Contract for the Protection of Unicco Business Interests," dated January 10, 2000, prohibiting her from disclosing or using confidential information, taking or trying to take customers, or hiring or trying to hire employees. In this agreement, "Key employees" is defined as those "making more than $20,000 per year."

73.     On March 15, 2013, Guisti announced her resignation from DTZ. Upon information and belief, Guisti communicated several times with both Lanzillo and Peterson during the period before her resignation and departure from DTZ, regarding the strategy for growing UG2 by unlawfully using DTZ's confidential information and breaching restrictive covenants, duties, and other obligations owed to DTZ. While still employed by DTZ but planning to join UG2, Guisti acquired interests that were adverse to DTZ and breached her duties owed to DTZ. In other words, while still employed and being paid by DTZ, Guisti became a "double agent" and began acting for the benefit of UG2, herself, and other Defendants. During the days, weeks and/or months leading up to her resignation and departure from DTZ, Guisti, without authorization and/or in excess of her authorization, accessed DTZ's confidential and proprietary information from DTZ's computer network and external electronic storage devices. On March 18, 2013, Guisti informed DTZ that she had decided to accept a position working for UG2 rather than another opportunity within DTZ. She immediately began working for UG2 as

Office Manager.  Upon information and belief, UG2, Lanzillo, Correia, Peterson, and Ryan targeted and recruited Guisti because of her significant knowledge of DTZ's confidential information, important customer relationships, and DTZ's good will with its customers.

### Recruitment of other DTZ Employees

74.     In addition, Lou Amaral, Kelley Owens, and Robert Kennedy, DTZ Operations Managers in the Northeast region who worked under and reported to Correia and Ryan, Michael Dunn, Senior Vice President, and Jennifer Haupt, DTZ's billing manager for National Accounts, recently were recruited to work for UG2.  Upon information and belief, UG2, Lanzillo, Correia, Peterson, and Ryan targeted and recruited Amaral, Owens, Kennedy, and Haupt because of their significant knowledge of DTZ's confidential information, important customer relationships, and DTZ's good will with its customers.  Upon information and belief, Lou Amaral, Robert Kennedy and Michael Dunn received offers of employment from UG2.

75.     In addition, George Doolin was a long-time employee of UNICCO and DTZ for more than 20 years.  Doolin signed an Agreement dated March 16, 1990, prohibiting him from disclosing or using the Company's confidential information, including information concerning the Company's customers; and for a period of two years after his employment terminated, from directly or indirectly soliciting business of any type carried on by the Company. In 2011, Doolin was promoted and became Vendor and Category Manager.  On September 10, 2012, Doolin announced that he was retiring at the end of the month.  Upon information and belief, Doolin has been recruited and hired by UG2.

76.     In addition, from approximately January to April 2013, UG2 recruited and hired the following former DTZ employees: David Thompson, Paul Walsh, Tami Drakulic, Tara Leverone, Michael Barbosa, and several other technical and customer service employees.  Also

Walter Crow, who was the General Counsel for North America for DTZ Global, Inc. (f/k/a United Group USA, Inc.) now serves as outside General Counsel to UG2.

77.     As a result of their many years of service to DTZ and their significant responsibilities as senior executives and managers, the defendants Lanzillo, Correia, and Peterson have had access to and knowledge of vast amounts of highly confidential, proprietary, and valuable information, regarding customer relationships and DTZ's good will with its customers, which is owned and controlled by DTZ. Among other things, the key employees who have been and are being recruited away from DTZ, including the defendants Ryan, Lezama, Desaulniers, Burnell, and Guisti, have valuable knowledge regarding DTZ's pricing models, contract structure, and profit margins which are critical to and provide a significant advantage when competing for business in a very competitive, price sensitive marketplace. The above allegations demonstrate the defendants' intentions and actions to misappropriate that information, and use it to benefit UG2 and themselves, in violation of their contractual agreements with and duties to DTZ.

**The Defendants' Unauthorized Access to DTZ's Computers and Misappropriation of DTZ Confidential and Proprietary Information**

78.     The Defendants did not merely give notice to DTZ and join the competing company UG2. Rather, while still employed by DTZ, Correia, Peterson, Lezama, Ryan, Desaulniers, Burnell, and Guisti acquired interests that were substantially adverse to DTZ and took actions that constituted serious breaches of their duties which they still owed to DTZ at the time of their continued employment. Those Defendants acted as "double agents," conspiring with each other, UG2, and Lanzillo, to unfairly compete against and harm DTZ. While still employed by DTZ and in violation of DTZ's policies and interests, those Defendants gained unauthorized access to DTZ's computer system and misappropriated DTZ's electronically stored

information, including computer files and email messages. The Defendants also misappropriated large quantities of DTZ's hard copy documents as well, including highly confidential documents relating to DTZ's current and prospective customers and business.

79.     In January, February, and March 2013, while conspiring and acting for the benefit of UG2, the Defendants Correia, Peterson, Lezama, Ryan, Desaulniers, Burnell, and Guisti plugged a total of at least 25 USB devices into DTZ's computers and accessed and/or copied DTZ's confidential and proprietary business information from and/or onto such devices. The Defendants took those USB devices with them when they left DTZ and joined UG2.

80.     In January and February 2013, after he had acquired interests adverse to DTZ and had begun working for the benefit of UG2, Correia plugged two USB devices into a DTZ computer and accessed at least ten computer files, which included among other things, DTZ's confidential and proprietary information concerning budgets, invoices, and other customer information. As of the filing of the First Amended Complaint and despite a court order requiring they be returned, those two USB devices have not been returned, and DTZ has not been able to conduct further forensic analysis of Correia's activities with such devices.

81.     In February and March 2013, after he had acquired interests adverse to DTZ and had begun working for the benefit of UG2, Peterson plugged three USB devices into a DTZ computer and accessed at least ten computer files. Peterson also copied to USB devices hundreds of DTZ business files containing confidential and proprietary information including, among other things, human resources files, strategic plans, budgets, presentations, and information regarding customer accounts.

82.     Peterson also used a program called "Crash Plan," an on-line backup storage solution, which appears to have copied the entire contents of the DTZ computer which had been

assigned to Peterson, including more than 55,000 files and 174 gigabytes of data.  Peterson purchased, installed, and began running the Crash Plan software approximately 5 days before announcing his resignation from DTZ, after he had acquired interests adverse to DTZ and had begun working for the benefit of UG2.

83.    In March 2013, after he had acquired interests adverse to DTZ and had begun working for the benefit of UG2, Ryan plugged two USB devices into a DTZ computer and accessed at least 33 computer files, which included among other things, DTZ's confidential and proprietary information concerning budgets, payroll information, and information concerning at least one customer that has since moved its business from DTZ to UG2.  As of the filing of the First Amended Complaint and despite a court order requiring they be returned, one of those USB devices has not been returned, and DTZ has not been able to conduct further forensic analysis of Ryan's activities with that device.

84.    In March 2013, after he had acquired interests adverse to DTZ and had begun working for the benefit of UG2, Lezama plugged three USB devices into a DTZ computer.  Lezama also used a program called "NTI Backup Now EZ" which appears to have copied more than 15,000 files to one of the USB devices.  The files copied to the USB devices include among other things, DTZ's confidential and proprietary information concerning budgets, payroll information, proposals, and other customer information.  As of the filing of the First Amended Complaint and despite a court order requiring they be returned, one of those USB devices has not been returned, and DTZ has not been able to conduct further forensic analysis of Lezama's activities with that device.

85.    In February and March 2013, after he had acquired interests adverse to DTZ and had begun working for the benefit of UG2, Desaulniers plugged eight USB devices into a

DTZ computer. Desaulniers also used a program called "Nero BackItUp" which appears to have copied more than 200,000 files to one of the USB devices. The files copied to the USB devices include among other things, DTZ's confidential and proprietary information concerning budgets, payroll information, proposals, and other customer information. As of the filing of the First Amended Complaint and despite a court order requiring they be returned, four of those USB devices have not been returned, and DTZ has not been able to conduct further forensic analysis of Desaulnier's activities with such devices.

86.     In March and April 2013, after he had acquired interests adverse to DTZ and had begun working for the benefit of UG2, Burnell plugged four USB devices into a DTZ computer. One of those USB devices appears to contain a copy of the entire contents of the DTZ computer, over 140,000 files. The files copied to the USB devices include among other things, DTZ's confidential and proprietary information concerning budgets, payroll information, proposals, and other customer information. As of the filing of the First Amended Complaint and despite a court order requiring they be returned, one of those USB devices has not been returned, and DTZ has not been able to conduct further forensic analysis of Burnell's activities with that device.

87.     In February and March 2013, after she had acquired interests adverse to DTZ and had begun working for the benefit of UG2, Guisti plugged three USB devices into a DTZ computer and accessed at least 13 computer files, which included among other things, DTZ's confidential and proprietary information regarding business strategy, financial information, and customer information. Two of those USB devices have not been returned, and DTZ has not been able to conduct further forensic analysis of Guisti's activities with such devices.

88.     Further, in approximately February, March, and April 2013, while conspiring and acting for the benefit of UG2 and while acting against the interests of DTZ, the Defendants Peterson, Lezama, Burnell, and Guisti also improperly used the DTZ email system to send DTZ's computer files containing confidential and proprietary information to UG2 and other Defendants.

89.     For example, while they were still employed by DTZ but after they had acquired interests adverse to DTZ and had begun taking actions for the benefit of UG2, Peterson and Guisti began using UG2 email accounts, with the domain name "@UG-2.com." While they were still employed by DTZ, Peterson and Guisti sent email messages and/or attachments from their DTZ email accounts to UG2 email accounts, containing DTZ's confidential and proprietary information, including among other things, information regarding DTZ's customers.

90.     In addition, for example, before and after his employment with DTZ had terminated, Peterson also used a personal email account, with the domain name "@gmail.com," upon information and belief, to send and receive DTZ's confidential and proprietary information.

91.     In addition, for example, while still employed by DTZ but after he had acquired interests adverse to DTZ and had begun taking actions for the benefit of UG2, Lezama used one or more personal email accounts, with domain names "@gmail.com" and "@yahoo.com" to send email messages to himself, containing DTZ's confidential and proprietary information, including among other things, information regarding DTZ's customers.

92.     In addition, for example, while still employed by DTZ but after he had acquired interests adverse to DTZ and had begun taking actions for the benefit of UG2, Burnell used a personal email account, with the domain name "@comcast.net" to send email messages

and attachments to himself, containing DTZ's confidential and proprietary information, including among other things, information regarding DTZ's customers.

93.　　　In addition, for example, after his employment with DTZ had terminated and after he had begun working for UG2, Peterson accessed his previous DTZ email account without authorization. Among other things, Peterson accessed his previous DTZ email account without authorization in March 2013 (while he was working for UG2) and sent email messages to Janet Guisti at a UG2 email account at a time when Guisti was still employed by DTZ. In one such message from Peterson to Guisti, for example, Peterson forwarded an internal, confidential DTZ email to Guisti at the UG2 email account and stated to Guisti as follows: "We should get copies of these docs and any other important Program Absolutes docs. Lets catch up tomm on our next steps for energy tracking?" In that message to Guisti, Peterson instructed Guisti to get copies of DTZ's confidential and proprietary documents. Peterson also made plans to communicate the next day with Guisti regarding UG2 business, all at a time when Peterson was working for UG2, Guisti was still employed and being paid by DTZ, and together they were acting for the benefit of UG2.

94.　　　In addition, for example, also in March 2013 after his employment with DTZ had terminated and he had begun working for UG2, Peterson accessed his previous DTZ email account without authorization and forwarded, to Lanzillo and Correia at UG2, an internal confidential DTZ email message and attachment, which contained DTZ's confidential and proprietary information.

95.　　　Further, after their employment with DTZ had terminated and after they had begun working for UG2, Peterson, Lezama, and Burnell, accessed DTZ's computer "Portal" without authorization. Peterson accessed DTZ's Portal, after joining UG2, without authorization

on at least 5 separation occasions. Lezama and Burnell each accessed DTZ's Portal, after joining UG2, without authorization on at least one occasion. DTZ's Portal provides a system for a user to gain remote access to DTZ's computer system using an internet connection. Once a user is connected to DTZ's computer system via the Portal, the user has access to, among other things, DTZ's email, business documents, customer information, invoices, policies and procedures, and many other categories of highly confidential and proprietary information. Peterson's, Lezama's, and Burnell's access to DTZ's Portal was without authorization and could not have been in furtherance of any legitimate or proper purpose. Upon information and belief, Peterson, Lezama, and Burnell gained unauthorized access to DTZ's Portal to misappropriate DTZ's confidential and proprietary information in furtherance of the Defendants' conspiracy, as alleged in this First Amended Complaint, and to benefit UG2 and the other Defendants.

96.     In addition, the Defendants misappropriated seven boxes of DTZ's hard-copy paper documents, which they took with them when they joined UG2. The Defendants did not return the seven boxes of DTZ's documents until after the Complaint was filed and a Temporary Restraining Order and Stipulated Preliminary Injunction Order were entered against them. The seven boxes of DTZ's documents contain several thousand pages, filling 3-ring binders, file folders, bound documents, and other collections of documents. The seven boxes contain DTZ's highly confidential and proprietary information, including among other things, DTZ's active contracts and amendments with existing clients, current contract pricing, annual client budgets, current costing models, staffing charts, proposals and presentations submitted to new clients during fiscal year 2013, proposals and presentations submitted to existing clients for expanded services during fiscal year 2013, current DTZ client list, DTZ's financial reports, and DTZ's

strategic plans. Many of the contracts include confidentiality provisions restricting the use and dissemination of the information outside of DTZ.

97.      Ultimately the defendants' intentions in taking these actions, including misappropriating DTZ's documents and electronically stored information, are to maliciously and unfairly compete against DTZ and to take DTZ customers for the benefit of UG2. And in fact, the Defendants have been engaged in exactly those activities. For example, in March 2013, DTZ received notice that a valuable customer, "Customer A," was terminating its contract with DTZ and was entering into a new business relationship with UG2.

98.      Further, DTZ also received notice, dated March 28, 2013, that another valuable customer, "Customer B," was terminating its contract with DTZ. The defendant Robert Ryan was responsible for the Customer B account for approximately 20 years during his employment at DTZ. Ryan communicated with Customer B during the period just prior to announcing his resignation from DTZ. Upon information and belief, Ryan and the other defendants have wrongfully solicited and usurped these customer relationships in violation of their agreements with and duties to DTZ.

99.      In March, April, and May 2013, DTZ has received notice that five additional customers have terminated their contracts with DTZ, and those customers have transferred their business to UG2.

100.      Since at least February and continuing through the filing of this First Amended Complaint, the Defendants have solicited and tried to obtain the business of several additional valuable customers of DTZ.

101.      UG2, Lanzillo, Peterson, Correia, Ryan, Desaulniers, Lezama, Burnell, and Guisti are actively working to further violate their duties and contractual obligations to DTZ and

to encourage and induce others to do the same. By their conduct, the Defendants intend to wrongfully appropriate DTZ confidential information, to recruit and hire additional DTZ employees, to wrongfully compete for and obtain DTZ's business relationships, and to achieve the ultimate goal of causing substantial financial harm and loss of good will to DTZ.

**"UGL" Trademarks and Logos**

102.　　As a successor to UNICCO and in its own right, the UGL family of companies has for many years been, and continues to be, a leader in the delivery of first-class facilities services throughout the world, including North America, and further including the New England area. These services include facilities management services for owners and operators of commercial and institutional properties.

103.　　DTZ is authorized to use and in fact uses the mark "UGL" and the UGL Logo mark (as defined below), to identify itself to actual and potential customers as an affiliate of the family of companies all operating under the corporate umbrella of UGL. Following the acquisition of UNICCO by UGL, the customers of UNICCO have come to recognize DTZ both as the successor to UNICCO and as part of the UGL family and brand. DTZ is also authorized and directed by UGL and UGL Europe to enforce these and related trademarks.

104.　　Use of the "UGL" mark is protected by trademark registration in the United States and elsewhere in the world. UGL is diligent about protecting its brand. UGL owns several federal registered marks, including "UGL", registered under U.S Registration No. 4,240,687; "UGL Services", registered under U.S. Registration No. 3,948,356; and "UGL UNICCO", registered under U.S. Registration Nos. 3,649,484 and 3,625,489. UGL also owns a certain distinctive logo mark consisting of the letters "UGL" and a curved "swish" ("UGL Logo"), registered under U.S. Registration No. 3,799,730. All of the preceding registrations are

on the Principal Register. Further, UGL Europe has applied for registration of a curved "swish" including the wording "DTZ a UGL company", together with the UGL Logo, which registration is currently pending at the USPTO. DTZ is authorized to use and enforce, and in fact uses and enforces, the foregoing names and marks. Plaintiffs have developed substantial goodwill in and with these marks, and these marks have come to represent the national and international strength of the UGL brand, and are therefore valuable to preserving their goodwill.

105. The registrations for the foregoing registered marks are valid, subsisting, unrevoked, uncancelled, and incontestable, and, through the authorization of its parent, confer upon DTZ a right to use the "UGL" names, marks, and logo in commerce in connection with, among other things, facilities management services. Plaintiffs have invested substantial sums marketing these services under the "UGL" names, marks, and logo and otherwise promoting the marks.

106. As a result of Plaintiffs' extensive promotion, advertising, and sale of their services, the UGL names and marks have become well and favorably known to the public.

107. Defendant UG2 has adopted the confusingly similar name and mark "UG2" for its business and is using a logo that is confusingly similar to the UGL Logo. UG2 uses the "UG2" name, mark and infringing logo in connection with the offer and sale of services (including facilities management services) that are also offered by DTZ and in direct competition with DTZ. UG2 has been marketing and continues to market such services to the same classes of customers and in some cases the same customers as DTZ.

108. The use of the mark "UG2" is prominently displayed on UG2's website. UG2's website contains an explanation of the letters and numeral in its name and mark to suggest to the public, including customers and potential customers of DTZ, that UG2 is some

kind of offshoot, affiliate or "next generation" of the UGL family of companies. Such an implication is false and confusing to customers and potential customers of DTZ. Upon information and belief, UG2 advertises and/or displays the "UG2" name and mark in many other ways and locations.

109. UG2 also uses a curved "swish" as part of its logo, thereby reinforcing the false and confusing implication to customers that UG2 is affiliated with DTZ or an offshoot of the UGL family of companies.

110. The "UG2" name, mark and logo are colorable imitations of Plaintiffs' trademarks and logo.

111. UG2's use of the "UG2" name, mark and logo are likely to cause confusion, or to cause mistake or to deceive purchasers of facilities management services.

112. UG2 and the other defendants have actual notice of DTZ's authorized use of its trademarks and logo, and Plaintiffs' ownership of and rights to such trademarks and logo, and have actual or constructive knowledge that the use of the "UG2" mark and logo infringes on Plaintiffs' trademarks.

113. By letter dated February 1, 2013 from Plaintiffs' counsel, UG2 was directed to cease and desist from wrongfully infringing on Plaintiffs' trademarks. Notwithstanding the demand, however, UG2 continues to use the "UG2" name, mark and logo and infringe on Plaintiffs' trademarks.

114. UG2's infringement as set forth above is unauthorized, knowing, willful and intentional.

## COUNT I

**Violation of the Computer Fraud and Abuse Act – Against All Defendants**

115.     The allegations of paragraphs 1 through 114 are hereby incorporated by reference as though fully set forth herein at length

116.     DTZ's computer system is used in or affects interstate and foreign commerce, and is used to access the Internet. DTZ's computer system is a "protected computer" within the meaning of the Computer Fraud and Abuse Act ("CFAA").

117.     Correia, Peterson, Ryan, Lezama, Desaulniers, Burnell, and Guisti violated the CFAA when they, knowingly and with the intent to defraud, intentionally accessed their respective DTZ-assigned computers without authorization and/or in excess of their authorization, including but not limited to when they took, without authorization, DTZ's valuable confidential and proprietary information and used it for their own and/or UG2's benefit.

118.     Lanzillo and UG2 violated the CFAA when they, knowingly and with the intent to defraud, conspired to have Correia, Peterson, Ryan, Lezama Desaulniers, Burnell, and Guisti intentionally access their respective computers without authorization and/or in excess of their authorization, and take, without authorization, DTZ's valuable confidential and proprietary information. By means of this conduct, Lanzillo and UG2 furthered their intended fraud and obtained things of value.

119.     DTZ has suffered damages and/or loss by reason of Defendants' actions in violation of the CFAA.

120.     Pursuant to the CFAA, DTZ is entitled to recover damages against Defendants.

121.     DTZ seeks recovery to the full extent permitted by the CFAA, including but not limited to loss aggregating at least $5,000 in value, including the cost of responding to and investigating the source of the theft of information from DTZ's computer network and the cost of conducting a damage assessment.

122.     Pursuant to the CFAA, DTZ is entitled to temporary and permanent injunctive relief enjoining Defendants from making any further use of DTZ's valuable confidential and proprietary information and requiring the return of all documents and things containing or embodying such information.

WHEREFORE, DTZ respectfully requests (a) judgment in its favor and against Defendants; (b) an award of damages including pre-judgment and post-judgment interest resulting from Defendants' actions; (c) entry of a preliminary and permanent injunction requiring Defendants to return all documents and things containing or embodying the information; (d) entry of a preliminary and permanent injunction enjoining Defendants from making any further use of DTZ's confidential and proprietary information; and (e) such other and further relief as this Court deems just and proper.

## COUNT II

### Breach of Contract

### Against Defendants Correia, Peterson, Ryan, Lezama, Desaulniers, Burnell, and Guisti

123.     The allegations of paragraphs 1 through 122 are hereby incorporated by reference as though fully set forth herein at length.

124.     In exchange for valuable consideration, the parties entered into binding contractual agreements identified above as the Contract for the Protection of Business Interests.

125. By virtue of the conduct alleged above, each of the defendants Correia, Peterson, Ryan, Lezama, Desaulniers, Burnell, and Guisti has violated the terms of each individual's Contract for the Protection of Business Interests with DTZ.

126. As a consequence of the foregoing, DTZ has suffered and/or will continue to suffer substantial and egregious harm.

WHEREFORE, DTZ demands judgment in its favor and against the defendants Correia, Peterson, Ryan, Lezama, Desaulniers, Burnell, and Guisti on the claim set forth herein for specific performance of the Contract for the Protection of Business Interests and for any actual and/or consequential damages, to the extent ascertainable, in an amount to be determined at trial, and other such relief as this Court shall deem just and appropriate.

## COUNT III

**Breach of the Confidentiality, Noncompetition and Nonsolicitation Agreement**

**Against Defendants Lanzillo, Correia, and Peterson**

127. The allegations of paragraphs 1 through 126 are hereby incorporated by reference as though fully set forth herein at length.

128. In exchange for valuable consideration, the parties entered into binding contractual agreements identified above as the Confidentiality, Noncompetition and Nonsolicitation Agreement.

129. By virtue of the conduct alleged above, each of the defendants Lanzillo, Correia, and Peterson has violated the terms of each individual's Confidentiality, Noncompetition and Nonsolicitation Agreement with DTZ.

130. As a consequence of the foregoing, DTZ has suffered and/or will continue to suffer substantial and egregious harm.

WHEREFORE, DTZ demands judgment in its favor and against Lanzillo, Correia, and Peterson on the claim set forth herein for specific performance of his Confidentiality, Noncompetition and Nonsolicitation Agreement and for any actual and/or consequential damages, to the extent ascertainable, in an amount to be determined at trial, and other such relief as this Court shall deem just and appropriate.

## COUNT IV

### Misappropriation of Proprietary and Confidential Information

### and Trade Secrets Against All Defendants

131.    The allegations of paragraphs 1 through 130 are hereby incorporated by reference as though fully set forth herein at length.

132.    By their individual and collective actions, including those described above, all of the Defendants have wrongfully misappropriated, disclosed, and/or used certain of DTZ's proprietary and confidential information and trade secrets.

133.    The copying, disclosure, use and/or destruction of such information by the Defendants constitutes an unauthorized copying, disclosure, or use of trade secrets and confidential information in violation of the common law and M.G.L. c. 93, § 42 *et seq*.

134.    DTZ has and will suffer substantial, immediate and irreparable harm and damages unless the Defendants are enjoined from disclosing and using such proprietary and/or confidential business information and trade secrets.

WHEREFORE, DTZ demands judgment in its favor and against each and every Defendant on the claim set forth herein as a result of their unlawful conduct for any actual, consequential, multiple and/or other damages, to the extent ascertainable, in an amount to be

determined at trial, injunctive relief and other such relief as this Court shall deem just and appropriate.

## COUNT V

### Conversion Against All Defendants

135.     The allegations of paragraph 1 through 134 are hereby incorporated by reference as though fully set forth herein at length.

136.     The Defendants Correia, Peterson, Ryan, Lezama, Desaulniers, Burnell, and Guisti, acting in concert with and for the benefit of each other, Lanzillo, and UG2, misappropriated, without legal justification or privilege, confidential, proprietary, and trade secret information belonging to DTZ.

137.     Upon information and belief, UG2 and the other Defendants are in possession of DTZ's confidential, proprietary and trade secret information and have failed to return such information to DTZ.

138.     The Defendants have exercised acts of ownership, control, or dominion over the misappropriated information.  Upon information and belief, the Defendants have had possession of the misappropriated information and have used such information in a manner that violates DTZ's rights to control the use of such information.

139.     As a consequence of the Defendants' actions, DTZ has suffered and will continue to suffer (or will suffer) substantial and egregious harm.

WHEREFORE, DTZ demands judgment in its favor and against the Defendants on the claim set forth herein, enjoining their unlawful conduct and for any actual, consequential and/or punitive damages, return of the misappropriated information, and other damages, to the extent

ascertainable, in an amount to be determined at trial, and other such relief as this Court shall deem just and appropriate.

## COUNT VI

### Breach of Fiduciary Duties

### Against Correia, Peterson, Ryan, Lezama, Desaulniers, Burnell, and Guisti

140.     The allegations of paragraphs 1 through 139 are hereby incorporated by reference as though fully set forth herein at length.

141.     As a result of their positions, titles, and responsibilities, the defendants Correia, Peterson, Ryan, Lezama, Desaulniers, Burnell, and Guisti owed fiduciary duties of loyalty and care to DTZ.

142.     By their actions, including those described above, Correia, Peterson, Ryan, Lezama, Desaulniers, Burnell, and Guisti violated their respective fiduciary duties of loyalty and care to DTZ.  The violations of their fiduciary duties include, without limitation, the following conduct while the defendants were still employed by DTZ:

- Planning to form a competing entity and/or planning to join a competing entity;

- Soliciting DTZ employees to leave their employment with DTZ;

- Initiating efforts to undermine or otherwise compromise DTZ business relationships with its customers, including soliciting or trying to solicit DTZ customers; and

- Misappropriating, disclosing, and/or using DTZ's confidential business information while employed by DTZ or thereafter.

As a consequence, DTZ has suffered and will continue to suffer (or will suffer) substantial and egregious harm.

WHEREFORE, DTZ demands judgment in its favor and against Correia, Peterson, Ryan, Lezama, Desaulniers, Burnell, and Giusti on the claim set forth herein, enjoining their unlawful conduct and for any actual, consequential and/or punitive damages, return of compensation, lost profits, training costs, and other damages, to the extent ascertainable, in an amount to be determined at trial, and other such relief as this Court shall deem just and appropriate.

## COUNT VII

### Civil Conspiracy Against All Defendants

143.    The allegations of paragraphs 1 through 142 are hereby incorporated by reference as though fully set forth herein at length.

144.    The Defendants have a common plan to work together and with others to encourage and induce the Defendants and others to violate their agreements with and duties to DTZ, including taking actions to improperly recruit and hire DTZ's senior executives, managers, and key employees, improperly obtain and use DTZ's proprietary and confidential information, and unfairly and improperly compete against DTZ to solicit and obtain DTZ's valuable customer accounts.

145.    Each of the Defendants is aware of the plan and of the plan's purpose.

146.    Each of the Defendants individually, and the Defendants acting together, have taken affirmative steps, including those actions alleged above, to further the achievement of the plan and its purpose.

147.    As a result, DTZ has suffered and will continue to suffer (or will suffer) substantial and egregious harm.

WHEREFORE, DTZ demands judgment in its favor and against the Defendants on the claim set forth herein, enjoining their unlawful conduct and for any actual, consequential and/or punitive damages, return of compensation, lost profits, training costs, and other damages, to the extent ascertainable, in an amount to be determined at trial, and other such relief as this Court shall deem just and appropriate.

### COUNT VIII

**Aiding and Abetting Breach of Fiduciary Duty**

**Against UG2, Lanzillo, Correia, and Peterson**

148.     The allegations of paragraphs 1 through 147 are hereby incorporated by reference as though fully set forth herein at length.

149.     As a result of their positions, titles, and responsibilities, the defendants Correia, Peterson, Ryan, Lezama, Desaulniers, and Burnell owed fiduciary duties of loyalty and care to DTZ.

150.     By their actions, including those described above, Correia, Peterson, Ryan, Lezama, Desaulniers, Burnell, and Guisti violated their respective fiduciary duties of loyalty and care to DTZ.  The violations of their fiduciary duties include, without limitation, the following conduct while the defendants were still employed by DTZ:

- Planning to form a competing entity and/or planning to join a competing entity;

- Soliciting DTZ employees to leave their employment with DTZ;

- Initiating efforts to undermine or otherwise compromise DTZ business relationships with its customers, including soliciting or trying to solicit DTZ customers; and

- Misappropriating, disclosing, and/or using DTZ's confidential business information while employed by DTZ or thereafter.

151.    The defendants UG2, Lanzillo, Correia, and Peterson, acting in bad faith and with the intent to harm DTZ, actively participated or substantially assisted in or encouraged the breaches by Ryan, Desaulniers, Lezama Burnell, and Guisti.

152.    As a result, DTZ has suffered and will continue to suffer (or will suffer) substantial and egregious harm.

WHEREFORE, DTZ demands judgment in its favor and against the Defendants on the claim set forth herein, enjoining their unlawful conduct and for any actual, consequential and/or punitive damages, return of compensation, lost profits, training costs, and other damages, to the extent ascertainable, in an amount to be determined at trial, and other such relief as this Court shall deem just and appropriate.

## COUNT IX

### Interference With Contractual Relations Against All Defendants

153.    The allegations of paragraphs 1 through 152 are hereby incorporated by reference as though fully set forth herein at length.

154.    At all times material, the Defendants knew or should have known of the existence and terms of the contractual relationships, as described above, between DTZ and each of the Defendants, as well as the contractual relationships between DTZ and the other employees named above.

155.    Despite such knowledge, the Defendants acting individually and in concert with each other interfered with the contractual relationships between DTZ and each Defendant, as well as the contractual relationships between DTZ and the other employees named above, by engaging in the conduct described above.

156.     Such interference by the Defendants was intentional, malicious and without legal justification, and was conducted by unlawful means for an illegal purpose.

157.     As a result, DTZ has suffered and will continue to suffer (or will suffer) substantial and egregious harm.

WHEREFORE, DTZ demands judgment in its favor and against the Defendants on the claim set forth herein as a result of their unlawful conduct for any actual, consequential and/or other damages, to the extent ascertainable, in an amount to be determined at trial, and other such relief, including equitable relief, as this Court shall deem just and appropriate.

## COUNT X

### Inducement of Breach of Contract

### Against UG2, Lanzillo, Correia, and Peterson

158.     The allegations of paragraphs 1 through 157 are hereby incorporated by reference as though fully set forth herein at length.

159.     The Contracts for the Protection of Business Interests, described above, constitute valid and binding contracts between DTZ and each of the defendants Correia, Peterson, Ryan, Lezama, Desaulniers, Burnell, and Guisti.

160.     At all material times, the defendants UG2, Lanzillo, Correia, and Peterson knew or should have known of the existence and terms of those contractual relationships, as described above, between DTZ and each of the Defendants, as well as the contractual relationships between DTZ and the other employees named above.

161.     Despite such knowledge, UG2, Lanzillo, Correia, and Peterson intentionally and wrongfully induced and proximately caused the breach of those Contracts for the Protection of Business Interests between the individual Defendants and DTZ.

162.     Such conduct by UG2, Lanzillo, Correia, and Peterson was willful, intentional, fraudulent, malicious, with wanton disregard for DTZ's legal rights, and without legal justification, and was conducted by unlawful means for an illegal purpose.

163.     As a result, DTZ has suffered and will continue to suffer (or will suffer) substantial and egregious harm.

WHEREFORE, DTZ demands judgment in its favor and against the defendants UG2, Lanzillo, Correia, and Peterson on the claim set forth herein as a result of their unlawful conduct for any actual, consequential and/or other damages, to the extent ascertainable, in an amount to be determined at trial, and other such relief, including equitable relief, as this Court shall deem just and appropriate.

## COUNT XI

### Tortious Interference with Business Expectancy

### Against all Defendants

164.     The allegations of paragraphs 1 through 163 are hereby incorporated by reference as though fully set forth herein at length.

165.     The Defendant tortiously and with the intent to injure DTZ, used the confidential and/or proprietary information about DTZ's employees and their employment, and other confidential and proprietary information that the defendants gained through their employment at DTZ to hire, solicit and/or encourage other employees to leave DTZ.

WHEREFORE, DTZ demands judgment in its favor and against all of the Defendants on the claim set forth herein as a result of their unlawful conduct for any actual, consequential and/or other damages, to the extent ascertainable, in an amount to be determined at trial, and other such relief as this Court shall deem just and appropriate.

# COUNT XII

## Intentional Interference with Advantageous Business Relations

## Against All Defendants

166.    The allegations of paragraphs 1 through 165 are hereby incorporated by reference as though fully set forth herein at length.

167.    DTZ had business relationships for economic benefit with third parties, including its customers.

168.    The Defendants knew of these business relationships that DTZ enjoyed with various parties, including its customers.

169.    The Defendants, through improper motive or means as described above, have tortiously and with the intent to injure DTZ, used the confidential and/or proprietary information about DTZ's business and customers, and other confidential and proprietary information that the defendants gained through their employment at DTZ to damage the business, reputation, and good will of DTZ for the defendants' benefit.

170.    As a result, DTZ has suffered and will continue to suffer (or will suffer) substantial and egregious harm.

WHEREFORE, DTZ demands judgment in its favor and against all of the Defendants on the claim set forth herein as a result of their unlawful conduct for any actual, consequential and/or other damages, to the extent ascertainable, in an amount to be determined at trial, and other such relief as this Court shall deem just and appropriate.

## COUNT XIII

### Federal Trademark Infringement – 15 U.S.C. §1114

### UGL Against UG2

171.    The allegations of paragraphs 1 through 170 are hereby incorporated by reference as though fully set forth herein at length.

172.    Defendant UG2 has willfully infringed UGL's rights in its marks and logo by various acts, including the offer, sale and marketing of facilities management services under the name and mark "UG2".

173.    Defendant UG2's use of the name and mark "UG2" and associated logo in connection with its business is without the permission or authority of UGL or any other party having the right to so authorize it.

174.    Defendant UG2's use of the name, mark "UG2" and associated logo are likely to cause confusion or mistake, or to deceive.

175.    Defendant UG2's actions as alleged above have caused or will cause damage to the business, reputation, and goodwill of UGL.  Defendant UG2's actions constitute violations of 15 U.S.C. §1114 which have caused and continue to cause UGL to suffer damage and irreparable harm.

WHEREFORE, UGL demands judgment in its favor and against Defendant UG2 on the claim set forth herein as a result of its unlawful conduct in an amount to be determined at trial, together with double or treble damages and attorneys' fees and costs under 28 U.S.C. §1117, and other such relief as this Court shall deem just and appropriate.

## COUNT XIV

### Common Law Trademark Infringement and Unfair Competition

### All Plaintiffs Against UG2

176.     The allegations of paragraphs 1 through 175 are hereby incorporated by reference as though fully set forth herein at length.

177.     The acts of Defendant UG2 constitute common law trademark infringement of Plaintiffs' rights in the "UGL" name, marks and logo and unfair competition with DTZ.

178.     Defendant UG2's use of the "UG2" name, marks and logo is likely to deceive the public into believing that services offered by UG2 are services of DTZ or other members of the UGL family or are somehow associated with or authorized by DTZ or another Plaintiff.

179.     Defendant UG2's acts have caused and will continue to cause damage and irreparable injury to Plaintiffs' business, reputation and goodwill.  Further, UG2's acts dilute the distinctive quality and strength of Plaintiffs' marks and logo.

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendant UG2 on the claim set forth herein as a result of its unlawful conduct in an amount to be determined at trial, and other such relief as this Court shall deem just and appropriate.

## COUNT XV

### False Designation of Origin and Unfair Competition – 15 U.S.C. §1125

### All Plaintiffs Against UG2

180.     The allegations of paragraphs 1 through 179 are hereby incorporated by reference as though fully set forth herein at length.

181.     Defendant UG2's use of the designation "UG2" and the related name, marks and logo, constitutes false designation of origin and false description and representation in

connection with services which is likely to cause confusion or mistake or deceive as to the affiliation, connection or association of Defendant's services in violation of 15 U.S.C. §1125.

182.     As a result of UG2's violation of 15 U.S.C. §1125, DTZ, UGL and UGL Europe have suffered and continue to suffer damage and irreparable injury.

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendant UG2 on the claim set forth herein as a result of its unlawful conduct in an amount to be determined at trial, together with double or treble damages and attorneys' fees and costs under 28 U.S.C. §1117, and other such relief as this Court shall deem just and appropriate.

## COUNT XVI

### Unjust Enrichment

### All Plaintiffs Against UG2

183.     The allegations of paragraphs 1 through 182 are hereby incorporated by reference as though fully set forth herein at length.

184.     Defendant UG2 has unjustly benefited and profited from its infringement of the UGL name and logo.  UG2's acts constitute and have resulted in unjust enrichment.

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendant UG2 on the claim set forth herein as a result of its unlawful conduct in an amount to be determined at trial, and other such relief as this Court shall deem just and appropriate.

## COUNT XVII

### Violation of M.G.L.  c. 93A, §11

### All Plaintiffs Against UG2, Lanzillo, Correia, and Peterson

185.     The allegations of paragraphs 1 through 184 are hereby incorporated by reference as though fully set forth herein at length.

186.     DTZ, UGL and UGL Europe are "persons" and engage in "trade or commerce" within the meaning of Mass. Gen. Laws c. 93A, §1.

187.     The Defendants UG2, Lanzillo, Correia, and Peterson are "persons" and engaged in "trade or commerce" within the meaning of Mass. Gen Laws c. 93A, §1.

188.     The actions of the Defendants as set forth above constitute willful and knowing violations of Mass. Gen. Laws. c. 93A, §11. Their wrongful practices include, without limitation, the following:

- misappropriating DTZ's proprietary and/or confidential business information and otherwise compromising its good will;

- tortiously interfering with DTZ's contractual relationships with its current and former employees;

- tortiously interfering with DTZ's contractual relationships with its current and prospective customers;

- utilizing misappropriated trade secrets, proprietary and/or confidential information for the purposes of targeting customers of DTZ;

- infringing the trademarks of DTZ, UGL and/or UGL Europe and falsely creating an impression as to the origin or association of defendant's services.

WHEREFORE, Plaintiffs demand judgment in their favor and against the Defendants UG2, Lanzillo, Correia, and Peterson on the claim set forth herein as a result of their unlawful conduct for any actual, consequential and/or other damages, to the extent ascertainable, in an amount to be determined at trial, including attorneys' fees, multiple damages, and other such relief as this Court shall deem just and appropriate

# COUNT XVIII

## Injunctive Relief Against All Defendants

189.     The allegations of paragraphs 1 through 188 are hereby incorporated by reference as though fully set forth herein at length.

190.     Unless the Defendants are permanently enjoined as set forth below, DTZ, UGL and/or UGL Europe will be irreparably harmed by:

A.     the disruption of DTZ's relationships with current and prospective employees;

B.     the disruption to its business by the departure of DTZ employees and the projects on which they work, causing DTZ to incur the unascertainable time and resources necessary to replace and train new employees;

C.     the disclosure, whether directly or indirectly, of DTZ's proprietary information and/or confidential information;

D.     the disclosure, whether directly or indirectly, of proprietary information and/or confidential information of DTZ's clients which DTZ is obligated to protect;

E.     the diversion of DTZ's corporate opportunities;

F.     the disruption of DTZ's relationships with current and prospective clients and the usurpation of DTZ's good will with current and prospective clients;

G.     continued infringement of Plaintiffs' trademarks; and

H.     present economic loss which is unascertainable at this time and may never be ascertainable, as well as future economic loss which is also presently incalculable.

WHEREFORE, DTZ respectfully requests that the Court permanently enjoin:

1.     The Defendants, for a period of two years following the date of the injunction, from violating the terms of any of the Defendants' agreements with DTZ as set forth in the Contract for the Protection of Business Interests, or from assisting, encouraging, or inducing others to violate those terms;

2.     The Defendants, for a period of two years from the date of the injunction, from soliciting or hiring employees of DTZ, as expressly set forth in the Contract for the Protection of the Company's Business Interests;

3.    The Defendants, for a period of two years from the date of the injunction, from soliciting or doing business with DTZ's customers as expressly set forth in the Contract for the Protection of the Company's Business Interests;

4.    The Defendants and their affiliates, from using in any way or disclosing at any time any confidential, proprietary, or trade secret information of DTZ;

and further, all Plaintiffs respectfully request that the Court permanently enjoin:

5.    Defendant UG2, and all those acting in concert with it, from using the designation or word "UG2" or similar derivative names and marks in connection with the advertising, sale or offering for sale of facilities management or other property services, or otherwise infringing the "UGL" trademarks and logo or using colorable imitations thereof; ordering UG2 to destroy or eliminate all infringing materials including signs, insignia, details, uniforms, business cards, letterhead, websites and all other materials containing the "UG2" name or logo; and further enjoining Defendant UG2 and all those acting in concert with it from supplying any facilities management or other property services until such time as UG2 ceases and desists all infringing activities; and

6.    All Defendants from doing any and all other acts as this Court deems necessary and appropriate.

Respectfully submitted,

DTZ, Inc.,
UGL Limited, and
UGL Europe Limited

By their attorneys,


/s/ John J. Commisso
Erik J. Winton, BBO # 600743
    WintonE@jacksonlewis.com
John J. Commisso, BBO # 647002
    John.Commisso@jacksonlewis.com
Paul Dubois, BBO # 670874
    Paul.Dubois@jacksonlewis.com
Jackson Lewis LLP
75 Park Plaza
Boston, MA 02116
(617) 367-0025


/s/ Gary W. Smith
Gary W. Smith, BBO#550352
    GSmith@pbl.com
David J. Reier, BBO #546202
    DReier@pbl.com
POSTERNAK BLANKSTEIN & LUND LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-8004
(617) 973-6100

Dated: June 24, 2013

## CERTIFICATE OF SERVICE

    I certify that this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.


/s/ John J. Commisso


4834-3348-4308, v. 1