UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DTZ, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| UG2 LLC, LOUIS LANZILLO, ) | |
| JOHN CORREIA, JEFFREY ) | |
| PETERSON, ROBERT RYAN, ) | |
| ARMANDO LEZAMA, ROBERT ) | |
| DESAULNIERS, SCOTT BURNELL, ) | |
| and JANET GUISTI, ) | |
| ) | |
| Defendants. ) | |
| _____) | Civil Action No. 13-cv-10906-PBS |
| ) | |
| UG2 LLC, LOUIS LANZILLO, ) | |
| JOHN CORREIA, JEFFREY PETERSON, ) | |
| ROBERT RYAN, ARMANDO LEZAMA, ) | |
| ROBERT DESAULNIERS, and ) | |
| SCOTT BURNELL, ) | |
| ) | |
| Plaintiffs-in-Counterclaim, ) | |
| ) | |
| v. ) | |
| ) | |
| DTZ, INC., UGL LTD., and ANTONIO ) | |
| ANDRADE, ) | |
| ) | |
| Defendants-in-Counterclaim. ) | |
| _____) | |

**OPPOSITION TO PLAINTIFFS' MOTION TO DISQUALIFY
ATTORNEY WALTER W. CROW**

INTRODUCTION

Plaintiff UGL Ltd. ("UGL") terminated Attorney Walter W. Crow from his employment in November 2011, long before defendant UG2, LLC ("UG2"), even existed and before any of the events giving rise to plaintiffs' claims in this case. Attorney Crow is now UG2's outside

1

general counsel – he has not entered an appearance in this case – and his past representation of UGL did not concern the facts of this case. Nonetheless, defendants ask the Court to "disqualify" UG2's trusted choice of general counsel and prohibit him from giving UG2 advice and representation regarding this litigation, the most important legal matter this young company faces. Plaintiffs' motion should be denied because plaintiffs have failed to demonstrate that the Court has the authority to regulate UG2's choice of general counsel, and because Attorney Crow's representation of UG2 is not substantially related to his past work for the plaintiffs.

## FACTUAL BACKGROUND

Walter Crow has been an attorney in good standing in Massachusetts since 1997, (Affidavit of Walter Crow, ¶ 2), but he began his employment in the facilities management industry in 1975, when he started as a part-time janitor for Macke Building Maintenance in Bala Cynwyd, Pennsylvania and thereafter earned a series of promotions at the company over a ten year period. (*Id.* ¶ 6). In 1986, he joined UNICCO Service Company as its Director of Operations. (*Id.* ¶ 7). From 1988 to 1997, he worked for UNICCO as Director of Technical Support. (*Id.* ¶ 8). During that period, between 1993 and 1996, while working full-time for UNICCO, Crow attended Suffolk University Law School. (*Id.* ¶ 9). Upon graduating in 1997, he became UNICCO Service Company's in-house lawyer, with the title of Vice President and Counsel. (*Id.* ¶¶ 9-10).

Between 1997 and 2003, Crow's responsibilities were largely confined to service and vendor contract review and negotiation. (*Id.* ¶ 10). In 1999, UNICCO hired a supporting attorney, Vanessa Eustace, under Crow's supervision; she and Crow worked together for the next eight years. (*Id.* ¶ 11).

2

In 2000, Crow worked with an outside attorney, Larry Reece, to draft a version of UNICCO's Contract for the Protection of Business Interests (the "Contract for Protection"). (*Id.* ¶ 15). Of the four restrictive covenant documents appended to the Second Amended Complaint in this matter, Crow was involved only in drafting the Contract for Protection. (*Id.*). The Contract for Protection was routinely signed by hundreds of individuals over the eleven years between 2000 and 2011. (*Id.* ¶ 16).

Crow was involved in establishing the Executive Severance policy at UNICCO, including its general terms of eligibility. (*Id.* ¶ 21). However, he had no involvement in the employment and promotion decisions leading to any individual defendants' becoming eligible for the program. (*Id.*).

From 2000 to 2011, administration of the Contract for Protection was primarily left to the Human Resources Department, Operations Department, Business Department, and other Departments. (*Id.* ¶ 15). Crow does not recall being required to make any material modification of the Contract for Protection for any individual employee or prospective employee. (*Id.* ¶ 15). Crow was never required to make a modification of the Contract for Protection for any of the individual Defendants in this action, other than to update the company name. (*Id.* ¶ 17). At no time was Crow involved in the hiring, promotion, compensation, or bonus awards of any of the defendants in the above-captioned action. (*Id.* ¶ 13).

In 2003, Crow was promoted to Vice President and General Counsel at UNICCO. (*Id.* ¶ 12). Crow was not involved in negotiating the terms and conditions of employment for any individual outside of the legal department. (*Id.*) Moreover, intellectual property made up only a small portion of the legal department's work, which Crow delegated to Eustace. (*Id.*)

In the spring of 2007, United Group, Limited (now UGL Ltd.) an Australian conglomerate, made a preliminary offer to purchase UNICCO. (*Id*. ¶ 22). From the time of the offer to purchase through the closing of the transaction in September, 2007, Crow spent virtually all of his time negotiating the terms and conditions of the final merger between UNICCO and United Group. (*Id*. ¶ 23). During the due diligence process leading up to the sale and thereafter, Vanessa Eustace, supported by a temporary attorney, took over the day to day operation of the Legal Department, including litigation management, employment disputes and human resources counseling relating to UNICCO. (*Id*. ¶ 24; Affidavit of David Giamichael, ¶ 8.). In March, 2008, after the purchase of UNICCO by UGL, Crow was promoted to General Counsel, UGL Ltd., North America. (Crow Affidavit, ¶ 25). Eustace was promoted to Crow's former position, as General Counsel for UNICCO (now called UGL Unicco). (*Id*.)

As General Counsel, UGL, Ltd., North America, Crow's primary responsibilities involved coordinating policies and decision making between UGL, Ltd. in Sydney, Australia and UGL Ltd.'s United States subsidiaries, UNICCO and UGL Equis. (*Id*. ¶ 26). In this position, Crow had little direct involvement with UNICCO's daily operations, as these were overseen by Vanessa Eustace, but rather, he was primarily involved with risk management issues, several proposed mergers, working on the coordination of the UGL Ltd.'s United States subsidiaries, negotiating financing agreements, guarantees and strategic alliances and other projects assigned by UGL Ltd.'s corporate management or requested by Louis Lanzillo. (*Id*. ¶ 27; Giamichael Affidavit, ¶ 9). As General Counsel, UGL, Ltd., North America, Crow reported to David Simpson, Chief Legal Officer, who was based in Sydney, Australia. (Crow Affidavit, ¶ 27).

Crow had no role in hiring, promotion, and compensation decisions following his promotion to General Counsel, UGL. Ltd., North America. (Crow Affidavit, ¶ 30). Crow was

4

not the author of the employee handbook, nor did he enforce it.  (*Id*. ¶ 31; Giamichael Affidavit, ¶ 11-13).  He was not responsible for negotiating the terms and conditions of employment for any defendant in this matter.  (Crow Affidavit, ¶ 32; Giamichael Affidavit, ¶ 13).

Crow was not responsible for hiring, promotion, or compensation decisions outside of the company's legal department.  (Crow Affidavit, ¶ 31).  Nor was he responsible for the protection of information technology systems or equipment.  (*Id*. ¶ 31).  During his tenure as General Counsel, Crow's oversight of litigation involving the Contract for Protection was limited to a single, 2005 case in which he retained outside counsel.  (*Id*. ¶ 34; Giamichael Affidavit, ¶¶ 15-16).  Similarly, Crow's involvement in the company's trademark enforcement activity was limited to a single case for enforcement of the UNICCO mark, which UGL has since allowed to expire.  (*Id*. ¶ 34).  Administration of trademarks and monitoring for possible infringement were left overwhelmingly with outside counsel.  (*Id*. ¶ 34).

Crow was terminated from UGL in November 2011.  (*Id*. ¶ 35).  Since that time, many of the persons to whom he reported, including UGL, Ltd's Chief Legal Officer as well as most of the chief executives for the various UGL subsidiaries with whom he communicated in his role as General Counsel have left the Company, either voluntarily or by termination.  (*Id*.).  The Company has changed radically since Crow's termination, with the acquisition of DTZ and a shift from facilities service to real estate management and brokerage, and with the blending in of facilities services divisions in Singapore, New Zealand and Australia. (*Id*. ¶ 36).  The company has changed from being a North American company primarily involved in facilities management and headquartered in Newton to a truly global real estate management and brokerage company headquartered in Los Angeles.  (*Id*.)  Crow has no privileged information concerning current management's decision making or strategic goals. (*Id*. ¶ 37).

5

After his termination by UGL, Ltd., Crow signed a separation agreement that, through incorporation of a 2008 Contract for Protection, affirms Crow's right to accept employment with a competitor provided he does not solicit DTZ customers or employees and provided he maintains the confidentiality of privileged information.  (*Id*. ¶ 38).  A copy of the relevant portion of Crow's separation agreement is appended to the Affidavit of Walter Crow as Exhibit 1.

Since December 2012, Crow has served as Outside General Counsel to UG2, LLC, a new company in the facilities and property services industry, the field in which he has worked exclusively for the past thirty-seven years. (*Id*. ¶¶ 5, 39).  During that period, he has not breached any obligations UGL or his ethical obligations to maintain attorney-client confidences.  (*Id*. ¶ 40).  Crow has provided oral and written advice to some of the defendants with regard to their continuing duties and obligations in becoming employed by UG2. (Id., ¶ 41).[1]  He has not entered an appearance in this litigation, and is not a member of the Bar of this Court.  (*Id.* ¶ 4).

In May, 2013, counsel for DTZ sent a letter to Attorney Crow contending that Crow's prior representation of DTZ prohibits him from representing the defendants not only with respect to this litigation, but also to Crow's "relationship and dealing with the defendants and their business interests, separate and apart from this litigation." (Plaintiffs' Motion to Disqualify, Exhibit A).  It would be impossible for Crow to serve as in-house counsel to any competitor in the facilities services area without having to take adverse positions, or offer advice, on the dozens of legal, business and human resources issues ascribed to his representation of plaintiffs either in Vanessa Eustace's Affidavit or the letter from DTZ's counsel.  (*Id.*, ¶ 42).  Indeed, after his termination by UGL, Ltd. Crow searched for over a year to find alternate employment, and

---

[1] Counsel hereby offers to provide detail of these privileged communications *in camera* at the request of the Court.

could find no employment other than an as a general counsel to a competitor in the facilities maintenance field.  (*Id.*, ¶ 42).

ARGUMENT

**I.  THE COURT LACKS AUTHORITY TO GRANT PLAINTIFFS' MOTION.**

Plaintiffs' motion should be denied because the Court lacks the authority to grant the relief it seeks.  It is true that, "as a supervisor of attorney conduct, a district court has inherent authority to disqualify attorneys ***who appear before it***."  *Moss v. TACC Int'l Corp.*, 776 F. Supp. 622, 623 (D. Mass. 1991)(emphasis supplied), *citing Kevlik v. Goldstein,* 724 F.2d 844, 847 (1st Cir. 1984).  However, Attorney Crow has not appeared before this Court, and does not intend to do so.  Plaintiffs cite no authority that would permit this Court, on a "motion to disqualify," to order a non-appearing, non-party attorney to refrain from giving advice on a particular subject to his client.  Moreover, Attorney Crow is not admitted to practice before this Court, rendering inapplicable Local Rule 83.6(4)(B), which concerns disciplinary rulings based on "[a]cts or omissions by an attorney ***admitted to practice before this court***. . . individually or in concert with any other person or persons . . . ."  (emphasis supplied) (Crow Aff., ¶ 4).

Perhaps in recognition of the Court's lack of jurisdiction over Attorney Crow, plaintiffs seek the same relief via a different route:  they ask the Court to prohibit "the Defendants, and anyone acting in concert with the Defendants, *from seeking legal advice or legal services* from Attorney Crow regarding the subject matter of this litigation." (Plaintiffs' Memorandum at 19)(emphasis supplied).  Plaintiffs cite no authority for such an order, and the Court should refuse to grant it for two reasons:  first, because it would violate defendants' First Amendment right to speak and associate with their attorney, and second, because it would amount to an impractical and unwarranted intrusion into the attorney-client relationship.

"The right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association and petition." *Denius v. Dunlap*, 209 F.3d 944, 953-54 (7th Cir. 2000); *citing DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 1990) ("The right to retain and consult an attorney ... implicates not only the Sixth Amendment but also clearly established First Amendment rights of association and free speech."); *Martin v. Lauer*, 686 F.2d 24, 32 (D.C. Cir.1982); *cf. Geders v. United States*, 425 U.S. 80, 91 (1976) (holding that an order preventing criminal defendant from consulting his counsel during trial recess for fear of conduct in violation of disciplinary rules impinged upon his Sixth Amendment right to the assistance of counsel).

To be sure, where an attorney is subject to the jurisdiction of a court, it may order the attorney to conform his or her speech and conduct to the disciplinary rules. However, plaintiffs cite no authority for the proposition that the Court may regulate a *client's* ability to ask questions of the attorney in order to enforce such rules. Such an order would be, in essence, a prohibition on speaking, and thus would amount to a prior restraint on the defendants' speech – a restraint for which there has been no showing of a compelling governmental interest. *See Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976) (holding that "prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights.")

Additionally, as a practical matter, the restraint on defendants' speech with their lawyer would introduce an unacceptable chilling effect on the relationship between UG2 and its counsel – a relationship that even the plaintiffs claim they are not seeking to terminate. (Plaintiffs' memorandum at 19, n. 7). Non-lawyers should not be expected to appreciate the extent of Rule

1.9 or its "substantial relationship" test, and this Court should not place UG2 in the position of being afraid merely to ask its attorney a *question*, for fear of contempt.

As we address more fully below, disqualification motions are highly disfavored under Massachusetts law. Here, absent some explanation of this Court's power to afford plaintiffs the requested relief, the Court should defer to Attorney Crow's best judgment on whether his current representation of UG2 causes a conflict of interest, and deny plaintiffs' motion. *Adoption of Erica*, 426 Mass. 55, 63 (1997) ("We encourage deference to an attorney's best judgment as to whether her representation of a client brings her into conflict with any provisions of the disciplinary code."); *see also* Comment 15 to Mass. R. Prof. Conduct 1.7 ("Resolving questions of conflict of interest is primarily the responsibility of the lawyer undertaking the representation.").

## II.     THIS CASE IS NOT "SUBSTANTIALLY RELATED" TO ATTORNEY CROW'S PRIOR REPRESENTATION OF UGL LTD. OR THE CORPORATE PREDECESSORS OF DTZ.

To the extent the Court reaches the merits of plaintiffs' motion, it should refuse to disqualify Attorney Crow. "[D]isqualification, as a prophylactic device for protecting the attorney-client relationship, is a drastic measure which courts should hesitate to impose except when absolutely necessary." *Adoption of Erica*, 426 Mass. at 58; *Slade v. Ormsby*, 69 Mass. App. Ct. 542, 545 (2007) ("[M]otions to disqualify must be considered in light of the principle that courts should not lightly interrupt the relationship between a lawyer and [a] client.") (internal quotations and citations omitted). The Supreme Judicial Court has frequently noted its "concern about the high cost to litigants and to the court system occasioned by motions to disqualify attorneys, especially when such motions are used as harassment and dilatory tactics." *Adoption of Erica*, 426 Mass. at 64-65, *citing cases*. "A disqualification may occur *only* if the

trial court judge determines that a lawyer's continued participation as counsel taints the legal system" *Slade v. Ormsby*, 69 Mass. App. Ct. 542, 546 (2007) (internal quotations omitted; emphasis in original).

Rule 1.9(a) of the Massachusetts Rules of Professional Conduct prohibits an attorney from representing a current client against a former client only when: (1) the current matter is adverse to the former client; and (2) the matters of the two representations are the "same or substantially related." Mass. R. Prof. Cond. 1.9(a); *see also Adoption of Erica*, 426 Mass. at 61; *Slade*, 69 Mass. App. Ct. at 546. The burden to establish that the former and present matters are the same or substantially related lies squarely with the party seeking disqualification. *See Clair v. Clair*, No. 10-1446-BLS1, 2011 WL 2342718, at *4 (Mass. Super. Ct. May 16, 2011) (Lauriat, J.). Plaintiffs have failed to carry this burden.

Because of its drastic and draconian impact on the lawyer-client relationship, the "substantial relationship" test "must be defined somewhat narrowly." *New England Pro Tour, Inc. v. Hebb*, CIV.A. 06-4901-BLS2, 2007 WL 1264140 (Mass. Super. Apr. 18, 2007)(Gants, J.). In determining whether a "substantial relationship" exists between the current and former matters, Massachusetts courts have examined the degree to which there are identical factual and legal issues presented in the two matters. *Chauban v. Dana Farber Cancer Institute, Inc.*, No. 99-6205A, 2001 WL 241493 (Mass. Super. Ct. Feb. 28, 2001) (Fremont-Smith, J.) (examining issues in two actions and determining that, although both involved claims of negligence against defendants, the actions were not substantially related because they did not involve the same issues). To make this determination, a court must engage in a "searching review" of the facts and, if it is inclined to grant the motion, must make detailed factual findings regarding the basis for the disqualification motion. *Slade*, 69 Mass. App. Ct. at 546-47 (case remanded to Superior

10

Court for further proceedings because allowance of motion for disqualification was not supported by sufficiently detailed factual findings supporting disqualification), *quoting Adoption of Erica*, *supra,* at 63-64.

Here, there are no common facts between the Attorney Crow's prior representation and this one. This case, of course, concerns plaintiffs' allegations that in late 2012 and 2013, UG2 began hiring away important DTZ employees; that those employees took allegedly confidential and proprietary DTZ documents with them; that DTZ has lost customers to UG2; and that there is allegedly a likelihood of confusion between the name UG2 and plaintiffs' trade names. (*See generally* Second Amended Complaint). All of the events underlying these claims took place more than a year after Attorney Crow was terminated from UGL. *See Adoption of Erica*, 426 Mass. at 62 (vacating disqualification order concerning care and protection proceeding where the child who was the subject of the proceedings "was not yet born when the former matters were concluded," and where the "issue involved here, the fitness of Dana as her parent, obviously did not arise directly or indirectly" in the prior representation). Moreover, the counterclaims pertain to UGL Ltd.'s failure to make required payments to Louis Lanzillo (an event in which Attorney Crow was not involved), its failure to pay promised bonuses and raises to other former employees, as well as DTZ's disparagement of UG2 and interference with its advantageous relationships – all of which are unrelated to with Attorney Crow's representation of UGL. Accordingly, plaintiffs cannot demonstrate that "[t]he factual cores of the two matters overlap significantly," and thus cannot show any "prospect that an attorney involved in both matters would be tempted to use confidential information on behalf of his current client to the detriment of the former client." *Alere, Inc. v. Church & Dwight Co., Inc.*, 2012 WL 1098420, *4 (D. Mass. March 31, 2012).

Nor are there any identical legal issues involved in the two cases. Plaintiffs' motion asserts, in the highest level of generality possible, that Attorney Crow provided legal advice to plaintiffs "regarding personnel, employment and human resources matters, including policies, procedures and practices concerning hiring, promotion, compensation, termination, employee handbooks, and employee conduct," as well as advice regarding "intellectual property issues." (Memorandum in Support at 4-5). Such generalities, even if accepted as true, simply are not sufficient to require Attorney Crow's disqualification. That is because, as Comment 2 to Rule 1.9 states unequivocally:

> a lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a wholly distinct problem of that type even though the subsequent representation involves a position adverse to the prior client.

Mass. R. Prof. Conduct 1.9, Comment 2. Tellingly, the plaintiffs present the Court with a block quote of the entirety of Comment 2 on page 13 of their memorandum, but replace the sentence above with ellipses. That sentence is fully applicable to this case.

As the Affidavits of Walter Crow and David Giamichael explain, Crow's involvement with the employment contracts that are the subject of this case, while perhaps "related" to some of the matters at issue, was so general that it cannot be deemed "substantially" related. Mass. R. Prof. Conduct R. 1.9. For example, Crow's affidavit states that after his promotion in 2003, he to the best of his knowledge and belief, he was "not involved in negotiating the terms and conditions of employment (i.e., salary, compensation, bonus, benefits, etc.) for any individual outside of the Legal Department." (Affidavit of Walter Crow at ¶ 12). He was not responsible for negotiating the terms and conditions of employment for any defendant in this matter. (Crow Affidavit, ¶ 32; Giamichael Affidavit, ¶ 13). Crow's oversight of litigation involving the enforcement of the Contract for Protection was limited to a single, 2005 case in which he

12

retained outside counsel; four other cases involved different "non-compete" issues. (Crow Affidavit ¶ 34; Giamichael Affidavit, ¶¶ 15-16). After Crow's further promotion to General Counsel, UGL Ltd., North America, employment-related matters were primarily handled by Eustace, who succeeded to Crow's position as General Counsel of the former UNICCO company. (Giamichael Affidavit, ¶¶ 8-9). Crow's primary responsibilities after 2007 involved coordinating policies and decision making between UGL, Ltd. in Sydney, Australia and UGL Ltd.'s United States subsidiaries. (Crow Affidavit, ¶ 26). In other words, as the years advanced toward his November 2011 termination, Crow had less and less involvement with the kind of employment issues at stake in this case – a factor that contributes to a lack of a "substantial relationship."

      The "underlying question" in determining whether a matter is "substantially related" is whether the lawyer "was so involved in the matter that the subsequent representation can be justly regarded as *a changing of sides in the matter at question*." Rule 1.9, comment 2. (emphasis supplied). The "matter[s] in question," as we have explained above, concern events in late 2012 and 2013, long after Attorney Crow had left the employment of UGL, and long after he had ceded day-to-day employment representation to Eustace. Attorney Crow simply cannot be deemed to have changed sides in the dispute between plaintiffs and the UG2 Parties.

      Nor does Attorney Crow's involvement thirteen years ago in drafting one version of one of the form contracts at issue in this case (the so-called, "Contract for the Protection of Business Interests"), and his later participation in drafting the Executive Severance Policy incorporating the document, make his current representation an example of "changing of sides." Plaintiffs rely heavily on a portion of comment 1 to Rule 1.9, which states as an illustrative example, "a lawyer could not properly seek to rescind on behalf of a new client a contract drafted on behalf of the

13

former client." Plaintiffs also cite *Smith & Nephew, Inc. v. Ethicon*, 98 F.Supp.2d 106 (D. Mass. 2000), which involved a motion to disqualify an attorney who had drafted the contract at issue in the case. In *Smith & Nephew*, however, Judge Stearns rested his disqualification ruling in large part on the fact that the attorney could be presumed to know facts because of the prior representation "that might prove harmful to [former clients'] cause," in particular, information concerning his former client's thinking concerning the meaning of the key, undefined contract term "self activated surgical staples." *Id.* at 110.

Here, by contrast, the plaintiffs have not identified any confidential information that Attorney Crow might have about his drafting of these forms that could reveal plaintiffs' "thinking" on any particular contract term or other subject that could be helpful to the defendants.[2] As Crow's affidavit demonstrates, his drafting of the documents was more akin to setting policy, rather than providing legal representation on the specific negotiation of a contract between two parties. (Crow Affidavit, ¶¶ 15-17). The administration of the Contract for Protection was primarily left to the Human Resources Department, Operations Department, Business Department, and other Departments. (Affidavit of Walter Crow ¶ 15). Crow does not recall being required to make any material modification of the Contract for Protection for any individual employee or prospective employee. (*Id*. ¶ 17). Crow was never required to make a modification of the Contract for Protection for any of the individual Defendants in this action, other than to update the company identity to reflect changes in the corporate name and structure. (*Id*. ¶ 17). *Contrast New England Pro Tour, Inc. v. Hebb*, involving a law firm's prior representation of a corporation "in the negotiation and execution" of an agreement in which the

---

[2] Some of the defendants are not even bound by the Contract for Protection as a matter of law. For example, Robert Ryan never signed the document. (Ryan Aff., ¶¶ 3-4). Armando Lezama did sign the document in 2000 but later left the company in 2006, and later returned to a job with different responsibilities. (Lezama Aff., ¶¶4-5).

corporation made factual representations that the later client claimed were untrue. *New England Pro Tour, Inc. v. Hebb*, CIV.A. 06-4901-BLS2, 2007 WL 1264140 (Mass. Super. Apr. 18, 2007).

In any event, the Court should reject plaintiffs' invitation to apply a *per se* rule that would prohibit an attorney from assisting in a defense against the enforcement of a contract the attorney had a hand in drafting. Massachusetts law requires a "searching review" of the facts in each case before a determination on the question of "substantial relationship" can be made, *Adoption of Erica*, 426 Mass. at 63-64, a requirement that is inconsistent with the kind of *per se* rule that plaintiffs propose. Here, the facts demonstrate that only in the most formal sense can the two engagements be deemed "related," and that relationship is not "substantial."

Plaintiffs' remaining reason for disqualification is that Attorney Crow gave general legal advice to one or more of the plaintiffs on intellectual property issues. (Memorandum in Support at 17). Even under plaintiffs' version of the facts, his alleged advice to the plaintiffs falls comfortably within the rule that "a lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a wholly distinct problem of that type even though the subsequent representation involves a position adverse to the prior client." Rule 1.9, comment 2. Attorney Crow's general involvement in such matters simply does not require his disqualification from this case.

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiffs' motion to disqualify Attorney Crow.

Respectfully Submitted,

UG2 LLC, LOUIS LANZILLO,
JOHN CORREIA, JEFFREY PETERSON,
ROBERT RYAN, ARMANDO LEZAMA,
ROBERT DESAULNIERS, SCOTT
BURNELL AND JANET GUISTI,

By their Attorneys,

*/s/ Jeffrey J. Pyle*
Daniel S. Tarlow, BBO #552920
Dtarlow@PrinceLobel.com
William A. Worth, BBO# 544086
Wworth@PrinceLobel.com
Thomas M. Elcock, BBO# 548027
Telcock@PrinceLobel.com
Jeffrey J. Pyle, BBO #647438
Jpyle@PrinceLobel.com
PRINCE LOBEL TYE LLP
100 Cambridge Street, Suite 2200
Boston, MA  02114
617-456-8000

Dated:  July 26, 2013

## CERTIFICATE OF SERVICE

I, Jeffrey J. Pyle, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated as non-registered participants, on July 26, 2013,

*/s/ Jeffrey J. Pyle*
Jeffrey J. Pyle